TURNER *v.* STATE.

89  547
117  515

## (*Nashville.* January 22, 1891.)

1. MURDER. *Second degree. Evidence sufficient.*

The facts set out in Court's opinion are held sufficient to support verdict for murder in second degree with sentence of fifteen years' imprisonment. (*Post, pp. 550–555.*)

2. CRIMINAL PRACTICE. *Appointment of Attorney-general pro tem.*

Appointment of Attorney-general *pro tem.*, by an order reciting that it was made "on account of the sickness" of the regular Attorney-general, is valid, and within the authority conferred by the constitutional provision empowering the Courts to make such appointment "in all cases where the Attorney for any district fails or refuses to attend and prosecute according to law." To state, in the order, a sufficient cause for the failure of the regular Attorney-general to attend, or for his failure to prosecute if present, is the same thing, in legal effect, as to state that he failed "to attend and prosecute." (*Post, pp. 555–558.*)

Constitution construed: Art. VI., Sec. 5.

Code cited: §§ 4733, 6083 (M. & V.); §§ 3962, 5242 (T. & S.).

Cases cited and approved: Douglass *v.* State, 6 Yer., 529; Isham *v.* State, 1 Sneed, 114.

Cited and distinguished or disapproved: Hite *v.* State, 9 Yer., 202; Staggs *v.* State, 3 Hum., 374; Pippin *v.* State, 2 Sneed, 45.

3. SAME. *Grand jury. Mode of selection.*

A Judge, who is directed and authorized by statute to appoint the grand jury of his Court, has performed that duty in a valid manner, where, instead of designating thirteen jurors in the first instance, he appointed and designated thirty-seven good and lawful men, from whom he selected a grand jury by lot in the usual way—the Judge afterward accepting and approving the thirteen jurors whose names were drawn. (*Post, pp. 558, 559.*)

Code construed: § 4253 (T. & S.).

4. SAME. *Same. Same. Objection frivolous and comes too late after appeal.*

Moreover, objection to the method pursued by the Judge in impaneling the grand jury "savors too much of refinement, even for criminal proceedings," and comes too late, being made for the first time in this Court. (*Post, p. 559.*)

Cases cited and approved: State *v.* Cole, 9 Hum., 628; McTigue *v.* State, 4 Bax., 314; Wallace *v.* State, 2 Lea, 31; State *v.* Dines, 10 Hum., 512.

5. SAME. *Argument of counsel.*

It affords no cause for reversal that counsel for the State, in his argument in a murder case, referred in a general way to the Cincinnati riot as a historical fact. (*Post, p. 565.*)

6. SAME. *Remarks of by-stander in hearing of jury does not vitiate verdict.*

Court will not set aside verdict in a criminal case solely upon the ground that a by-stander made an improper remark in the presence of the jury during their consideration of the case. (*Post, p. 564.*)

7. EVIDENCE. *Defendant's statement made after the killing not admissible, when.*

Where it is entirely clear upon the proof that the deceased made no demonstration indicating that he had a weapon, or that he intended to draw one at the time he was fatally shot, it is not error to reject defendant's statement, made a few minutes after the difficulty had ended, to the officer arresting him, in which he said: "Hold on, those men [meaning deceased and his friend] are armed." This statement, if admitted, only proves defendant's belief that deceased was armed, which, in the absence of any demonstration, was wholly immaterial. (*Post, p. 559.*)

8. SAME. *Dying declaration. Mode of proving.*

Where dying declaration was committed to writing, and signed by the declarant at the time it was made, the writing, if in existence, is the primary evidence of such declaration, and must be produced. Parol evidence of such declaration is not admissible. (*Post, pp. 559, 560.*)

Case cited and approved: Epperson *v.* State, 5 Lea, 297.

Cited and distinguished: Beets *v.* State, Meigs, 109.

9. SAME. *Same. Verified by oath.*

Dying declarations, verified by the declarant's oath, are admissible in evidence. "The dying declaration has the sanction of an oath, and

therefore the added oath can give it no additional verity. Two men swearing to a statement may strengthen it, but one man swearing to it a second time cannot." (*Post, pp. 560, 561.*)

10. EVIDENCE. *Admission of irrelevant not error, when.*

Admission, over defendant's objection, of irrelevant evidence is not reversible error, even in a criminal case, where the defendant's guilt satisfactorily appears from the other evidence, and the Court can clearly see that the evidence improperly admitted did not affect the result nor damage or prejudice the defendant. The rules of evidence are the same in criminal as in civil cases. (*Post, pp. 561, 562.*)

Code construed: ¿ 6221 (M. & V.) ; ¿ —— (T. & S.).

Cases cited and approved : Draper *v.* State, 4 Bax., 254; Wilson *v.* Smith, 5 Yer., 381, 409; Clark *v.* Rhodes, 2 Heis., 206; McAdams *v.* State, 8 Lea, 463.

11. SAME. *Exhibition before jury of injured parts of deceased's body.*

On trials for homicide it is not error for the Court to permit portions of the body of the deceased to be exhibited before the jury for the purpose of explaining the nature, cause, extent, etc., of the wounds causing the death. (*Post, pp. 564, 565.*)

12. CHARGE OF COURT. *As to impeachment of defendant's veracity.*

The Court's omission to charge that evidence impeaching defendant's testimony in a criminal case should not weaken the presumption of his innocence, is not error where the Court had given, as an independent proposition, the usual charge as to the presumption of innocence indulged in favor of one accused of crime. (*Post, p. 562.*)

Case cited and distinguished: Peck *v.* State, 86 Tenn., 260.

13. SAME. *As to self-defense.*

In a case of homicide where the deceased, though insulted by defendant's language, neither inflicted nor offered to inflict violence upon him, there is no error in the Court's charge that "if the difficulty in which it is insisted that the deceased was killed, was brought about by the fault, design, or contrivance of the defendant, then the defendant cannot excuse himself as for a killing in self-defense, unless he, in good faith, used all means in his power to escape and abandon the difficulty before resorting to the fatal shot;" this language being qualified by the further statement that "no mere words, how oppro-

brious soever they may be, will justify an assault." (*Post, pp. 562–564.*)

Cases cited and distinguished: Smith v. State, 8 Lea, 402; Daniel v. State, 10 Lea, 263; Fisher v. State, 10 Lea, 152.

---

### FROM DAVIDSON.

---

Appeal in error from Criminal Court of Davidson County.   G. S. RIDLEY, J.

MATT W. ALLEN and PITTS & MEEKS for Turner.

Attorney-general PICKLE and W. H. WASHINGTON for State.

DICKINSON, Sp. J.   Turner was indicted for killing Thomas A. Holton, was convicted of murder in the second degree, and sentenced to fifteen years in the penitentiary.

The wound of which Holton died was inflicted by Turner May 15, 1889, in the office of Aris Brown, Justice of the Peace, in Nashville, while the Magistrate had under consideration the postponement of a case that had been called for trial. Besides Turner, Holton, and Brown, there were present in the room Holman, the attorney of Turner, Bland, a business partner of Holton, and Frasch.

Bell Reddick testifies that he was on the street

just at the door, and saw all that occurred. When the altercation which preceded the shooting began, Turner was standing in front of the Magistrate, within a railing dividing the room. Holton and Bland were just outside of the railing next to the wall. At the opposite end of the railing from them, at the other wall, was a gateway admitting passage to the rear section of the room, where Turner was standing. A question arose as to continuing the cause, on the ground that the attorney of Holton and Bland was absent. Turner insisted on a trial. It had been postponed from an earlier hour in the morning at Turner's instance. Holton said that Turner's lawyer was not present at the hour fixed. Turner said he was. This affirmation and denial were repeated by them several times, and then Turner said: "You are a damned liar!" Holton then said: "You must take that back!" and moved along the railing in the direction of the gateway, which was five or six feet from where he was standing. Bland followed him. Holton made no threat other than the words quoted. Bland said nothing, and made no demonstration. When Holton reached the gateway Turner drew his pistol and fired, Holton turning his face from him as soon as he saw the pistol, thus exposing the rear of his right side. Turner fired quickly, and Holton fell with his head toward the street door. Holton was searched, and no weapon, not even a pocket-knife, was on him. He was in his shirt sleeves. When Turner fired, Holton

was from nine to eleven feet from him. The entrance and course of the ball · showed that the back of Holton was exposed to the shot.

As to the foregoing facts there is no controversy. The conflict of evidence is upon the action and demonstrations by Holton in moving from his first position to the point where he was shot. Turner claimed that he believed, and had reason to believe, that it was necessary to shoot in self-defense. He testified as follows: "Then he started at me with his fist clinched, and said: 'You have got that to take back!' I said: 'I am not going to do it.' I just turned around right in my tracks and unbuttoned my vest facing him. When he got to the gate he put his · right-hand back to his hip-pocket, and I pulled and fired as quick as that [illustrating]. He was very angry."

On cross-examination he said: "He turned when I shot." Defendant said that he was cool and not excited at the time. As stated previously, there were but five witnesses to the shooting besides the principals. On this point they testify, in substance, as follows:

Justice Brown said that Holton spoke quick, but not in a very angry manner; that he was very mild under the circumstances; that he did not start around in an angry manner, but moved off slowly; that he saw no demonstration by Holton, but did not see the position of his hands, as witness was looking at Turner.

Holman says that he saw Holton make no

demonstration of any sort; that he did not attempt to draw a weapon as he walked down the railing; that he did not see Holton as distinctly as he saw Turner, and could not say whether Holton had his hands on his side or where, or what he was doing with them at the instant of firing, as he was then looking at Turner. Witness said to Turner as he was drawing his pistol, "Don't, Jim," but is not certain that Turner heard him.

Bell Reddick says that Holton, as Turner reached for his pistol, turned his body as if to escape the shot; that he made no demonstration to draw any weapon; that he had both hands held up in front of him as he walked down the railing.

Bland says that Holton walked down the railing holding his hands out in front of him; that Holton, about the time he turned around, called to Turner not to shoot.

Frasch, a witness for defendant, testifies that Holton, when he got in the gateway, started in a fighting position towards Turner, and that his right hand went down before he was shot. Cross-examined as to the exact time the hand went down, he makes it simultaneous with the fall of the body and the firing of the shot. He says: "I think he turned when he saw Mr. Turner was going to shoot, and the hand went down immediately."

Holton, in his dying declaration, says: "When I faced him, at the time I reached the opening, I

saw him throw open his vest with his hand. I saw his pistol which he drew with his right-hand, and at that' instant I threw my right sidé toward him and he fired immediately. At the time I was approaching him my hands were in front of me, or partially raised from my side, and in no angry manner." Thus it appears that defendant is entirely unsupported in his statement that the deceased made a movement as if to draw a weapon, and is flatly contradicted by Holton, Reddick, and Bland. Besides, every other witness but Frasch testifies that Holton, in moving toward the gate, was not angry, not threatening in manner. Two physicians who made a post mortem examination testified that the arm was not wounded, and that it would have necessarily been penetrated had it been put in any natural position for the purpose of reaching the hip or side pocket. The proof further showed that Turner bore Holton ill-will on account of what he considered a previous wrong. The plea of self-defense has nothing to support it.

Several alleged errors are relied on for reversal, and have been urged. with so much earnestness and ability that they will be considered in detail.

*First.*—It is insisted that the indictment is a nullity, because it is signed by an Attorney-general *pro tem.* whose appointment was void. Under Sub-section 8 of § 6083 of the Code, if the record failed to show the appointment of the Attorney-general *pro tem.*, after plea of not guilty and con-

viction, defendant could not avail himself of any error in the appointment. In this case the record sets out the appointment as follows: "On account of the sickness of Attorney-general M. R. Priest, the Court appoints W. M. Hart Attorney-general *pro tem.*, said Hart being duly sworn as the law directs."

Article VI., Section 5, of the Constitution provides that the Court may appoint an attorney *pro tem.* "in all cases where the attorney for any district fails or refuses to attend and prosecute according to law." Section 4733 of the Code undertakes to amplify this, but this does not affect this case. It is claimed that, inasmuch as the order is before this Court, and specifies the sickness of the Attorney-general, and not his failure or refusal to attend and prosecute as the ground of action, the appointment is void. This of course excludes all presumptions that the Judge knew and performed his duty, and that the order stated merely the reason why the Attorney-general was not present, or, if present, why he failed to prosecute. The contention of counsel is that the order (if it undertakes to set forth any reason) must show that the Attorney-general failed to attend and prosecute, and that, so far as is shown by this order, he may have been present though sick, and, if present at all, the Court could make no valid appointment.

In *Hite* v. *State*, 9 Yer., 202, it was held that "before the Court can appoint an Attorney-general *pro tem.*, the record must show that the officer appointed by the State is absent."

Turner *v.* State.

In *Staggs* v. *The State*, 3 Hum., 374, the Court says: "When, therefore, we see the name of another person than the regularly appointed Attorney-general to a bill of indictment, we must see from the record his appointment and the facts that authorized it."

Doubtless to meet these and like technical decisions, and to prevent criminals who go to trial without raising such points, and are fairly convicted on the evidence, from escaping through mere irregularities in the record which do not prejudice their rights, the Act of 1852 (§ 6083 of the Code) was passed.

In *Pippin* v. *State*, 2 Sneed, 45, upon an order reciting the incompetency of the Attorney-general, by reason of having been employed before his election to defend Pippin, as the ground for appointment, the indictment signed by such appointee was held void, the Court saying "the facts must appear on the existence of which the validity of the appointment depends," and that it did not appear that the Attorney-general refused to prosecute or take any action in the case, and therefore the Court, in declaring him incompetent and making the appointment on that ground, made "a new cause not stated in the Constitution." It would seem that this Court might have presumed that the Attorney-general had declined to act for the reason stated, and that the appointment was properly made, and that the order, in stating the reason that prompted the Attorney-general, by im-

plication stated his action. Some facts are of themselves so pregnant that other facts which are their legitimate offspring are included in their statement, and it would seem that the statement that an Attorney-general had been previously employed to defend a prisoner, followed by the Court appointing an Attorney-general *pro tem.* for that reason, necessarily implied that he had declined to prosecute, that being the course he would be expected to pursue.

In *Douglass* v. *State,* 6 Yer., 529, the order recited no cause for the appointment, and the indictment was sustained, Judge Catron saying: "The Court could not else than know that the Attorney-general was absent, and it was its duty to appoint a deputy for the time being."

In *Isham* v. *State,* 1 Sneed, 114, Judge Caruthers said: "It must be presumed that the Court would not permit any one to enter upon and discharge the important functions of this officer without the existence of some necessity and a regular appointment. The day has now passed for rescuing the guilty upon mere technicalities."

When the Court has jurisdiction "we are bound to presume they acted correctly, and that the proceedings are according to law unless the contrary appears." Martin & Yerger, 176.

The Constitution says the Attorney-general must "attend and prosecute." Therefore, though he attend, yet should he fail to prosecute, whether from sickness or any other cause, the Court may ap-

point. It is absurd to suppose that the Judge would have made the appointment if the regular Attorney-general were in attendance and ready to prosecute. The appointment was made on account of his sickness, which is equivalent to saying (presuming as we do that the Judge knew and did his duty) that sickness had either prevented him from attending or from prosecuting; and it makes no difference which was meant, as he could appoint in either contingency.

*Second.*—The Judge selected the *venire*, and the grand jury was drawn from it as provided in § 4791 of the Code. It is insisted that he should, in accordance with § 4253 (old Code), have appointed the grand jurymen. The object is to have the Judge himself select "good and lawful men." If he "duly appoint and designate" each and every one of thirty-seven "good and lawful men," as the record shows he did, then the thirteen drawn by lot have all and singular been appointed by him, and, after such selection, their acceptance by him is a sufficient approbation, and meets all the purposes of the statute.

The objection, in the language of Judge Turley in *State* v. *Cole*, 9 Hum., 628, "savors too much of refinement, even for criminal proceedings." Besides, it comes too late, the defendant making it for the first time in this Court. The law is correctly stated as follows: "The defendant pleaded not guilty to the bill of indictment, and went to trial and was convicted; after this he shall not

be permitted to object to the *venire*, or to the jurors summoned under it. If he have legal objection to the one or the other, he must avail himself of it, either by motion or plea, before he puts himself upon his country for his deliverance by his plea of not guilty. It is afterward too late." *State* v. *Cole*, 9 Hum., 628; *McTigue* v. *State*, 4 Bax., 314; *Wallace* v. *State*, 2 Lea, 31; *State* v. *Dines*, 10 Hum., 512.

*Third.*—Defendant offered to prove by the officer who arrested him a few moments after the shooting that defendant said to him: "Hold on, those men are armed." The Judge did not permit witness to answer, and error is assigned. At that time, although but a few moments had elapsed after the shooting, the affair was ended. Holton was prostrate, and Bland was down by his side. It could, if admissible, tend to show nothing but the belief, on the part of defendant, that when he fired these men were armed. That question is wholly immaterial in the light of the overwhelming proof that neither of them made any demonstration such as would indicate their having any weapon, or a purpose to draw a weapon.

*Fourth.*—The dying declaration was written out and was signed and sworn to by Holton. It is excepted to on the ground that witnesses who heard it should have testified to the declaration, using the writing, if necessary, only to refresh the memory, the writing not being itself admissible. It

is also objected to because it is sworn to, it being said that the oath adds "additional verity not provided for by law;" and that it is, in effect, also a deposition, which cannot be introduced against a defendant in a criminal case.

In *Beets* v. *State*, Meigs, 109, the witness did not state whether or not he recollected the declaration, but a copy of a statement taken by him was admitted in evidence, and this was error.

Greenleaf says that if the declaration be committed to writing, and signed at the time it was made, the writing must be produced. If it be a deposition, and made *in extremis*, it may be admitted as a dying declaration. Greenleaf on Ev., Sec. 161. To same effect see Wharton on, Crim. Ev., Sec. 295.

This rule is cited as the law in *Epperson* v. *The State*, 5 Lea, 297. The entire current of authority in England and in this country is to the same effect. The authorities are collected in *State* v. *Kindle*, 24 N. E. Rep., 485; 31 Central Law Journal, 142.

Truth is the object of every investigation in criminal as well as civil causes. The dying statement being evidence, should be reproduced with the utmost fidelity possible. It is an universal rule that an original writing is always the best evidence. There is no reason why an exception should be made in a criminal case, and that the uncertain report of words from memory should be substituted for the absolutely correct record in

writing. The dying declaration has the sanction of an oath, and therefore the added oath can give it no additional verity. Two men swearing to a statement may strengthen it, but one man swearing to it a second time cannot.

*Fifth.*—Holton in his declaration says that his intention was to reason with Turner to get him to correct his statement. It is objected that the admission of this statement of the intention he had in approaching Turner is reversible error.

The rules of evidence are the same in criminal and civil cases. Code, § 6221.

"If the evidence, although not strictly admissible, is not of a character to damage the defendant, or, as it has been otherwise expressed, if the Court can clearly see that the error has not influenced the result, it is no ground for a new trial." *Draper* v. *State*, 4 Bax., 254; *Wilson* v. *Smith*, 5 Yer., 381, 409; *Clark* v. *Rhodes*, 2 Heis., 206; *Patterson* v. *Head*, 1 Lea, 664; *McAdams* v. *State*, 8 Lea, 463.

"And ordinarily, when a prisoner's guilt is made out clearly by positive testimony, it should be no ground for a new trial in this Court that evidence was introduced which was not strictly admissible, if the Court can see that the defendant was not prejudiced thereby." *McAdams* v. *State*, 8 Lea, 464.

The testimony was irrelevant, and should have been excluded, for it could have no bearing upon the issue, which was whether Turner, from what occurred, had reasonable grounds for believing

36—5 p

that it was necessary to kill in self-defense. The verdict is amply sustained by competent evidence, independent of this testimony, and the result could not, on any reasonable hypothesis, have been influenced by it; for his intentions might have been ever so fair, yet, if his acts were hostile, Turner would have been justified in shaping his conduct by them alone.

*Sixth.*—Turner, in his testimony, said, in effect, that he did not know the deceased, and witnesses were introduced to disprove this statement. It is insisted that the Judge should have charged the jury that this impeachment of Turner should not be permitted to weaken the presumption of innocence in his favor. In the light of all this evidence he instructed the jury that they must presume the innocence of the defendant, and this was unqualified. It was not his duty to charge the manifest truth that this impeachment of veracity had no connection with the presumption of innocence of a charge of murder. It would affect the credibility of his testimony only.

In *Peck* v. *State*, 2 Pickle, 260, cited for defendant, the only point decided by the Court was that the general character of a defendant, testifying for himself, could be impeached.

*Seventh.*—The Court charged: "In the present case, if the difficulty in which it is insisted that the deceased was killed, was brought about by the fault, design, or contrivance of the defendant, Turner, then the defendant cannot excuse himself as

for a killing in self-defense, unless he, in good faith, used all means in his power to escape and abandon the difficulty before resorting to the alleged fatal shot." It is insisted that this makes the case "turn on the fact that Turner called Holton a damned liar, and immediately after this Holton and Bland made an assault upon Turner;" and that Turner is deprived of the justification of self-defense, because the Court instructs that after the difficulty was thus brought on by him he should have tried to escape and abandon the fight before shooting. The Court did not assume in his charge the fact that Holton and Bland made an assault, or that either of them engaged in a difficulty, and the proof is that they did neither.

In *Smith* v. *State*, 8 Lea, 402, the erroneous charge was, in substance, that the defendant, although first assailed and struck, is guilty, if he willingly engaged in the fight. To the same effect was the charge in *Daniel* v. *State*, 10 Lea, 263. These cases, and *Fisher* v. *State*, 10 Lea, 152, are relied on for defendant to sustain this exception. In each of those cases the fighting was mutual. Holton made no assault whatever. The charge excepted to is substantially like that in the Fisher case, which was sustained. There, as here, it was "argued that this means if the defendant may use insulting or provoking language, and, in consequence, the deceased attacked him, the defendant could not fight in self-defense."

Judge McFarland said: "That this is not the

meaning of the charge is shown from other portions of it, in which his Honor instructs the jury that mere words, however insulting, do not justify an assault." In the present charge the Court said: "No mere words, how opprobrious soever they may be, will justify an assault." The jury, therefore, must, taking the whole charge, have understood that Holton, and not Turner, would have been the person in fault if Holton had assaulted Turner.

*Eighth.*—On a motion for a new trial it was alleged that one of the attorneys for the State, in his argument, alluded to a rumor that a juryman had gone on the jury to hang it, and that he mentioned a juryman's name so as to connect him with the charge. If this had occurred, the trial Judge would have been grossly derelict in duty not to have severely rebuked it, and, for such misconduct in argument, the verdict should not be permitted to stand. The evidence in this case does not sustain the charge. From what the record shows to have been said, the assignment entirely fails. The juryman testifies further that, as the jury passed by, some one said: "There is the juryman Mr. Sloan picked out to hang the jury." If the fact that a by-stander made a remark, however opprobrious, within the hearing of a jury were made a ground for setting aside a verdict, then trials would have no stability. It might be different, taken in connection with the main charge, had it been sustained.

*Ninth.*—A section of Holton's ribs and vertebra

was given in evidence; and this is excepted to, on the ground that it was calculated to inspire the jury with such horror as to influence their verdict. It was introduced for the purpose of showing the direction and lodgment of the ball, and was clearly admissible.

*Tenth.*—It is insisted that one of the attorneys for the State used improper argument in referring to the Cincinnati riot. The bill of exceptions shows that it was done only in a general way as a historic fact, without any application being made to the case at bar. .

The facts fully sustain the verdict, and there is no reversible error in the record. The judgment is affirmed.