Ronald Lewis SOTKA, alias ,Ronald Lewis Freeman, Plaintiff-in-Error,

v.

STATE of Tennessee, Defendant-in-Error.

Court of Criminal Appeals of Tennessee.

Feb. 3, 1972.

Certiorari Denied by Supreme Court July 17, 1972.

William C. Wilson and R. Price Nimmo, Nashville, for plaintiff in error.

David M. Pack, Atty. Gen., Robert H. Roberts, Asst. Atty. Gen., Nashville, Ron-

ald A. Webster, Dist. Atty. Gen., Knoxville, for defendant in error.

## OPINION

OLIVER, Judge.

Represented by retained counsel, two separate cases against Ronald Lewis Sotka, alias Ronald Lewis Freeman, in which he was indicted for the first degree murder of his wife Patricia and his step-daughter Donna, respectively, were tried together with the consent and agreement of his counsel and the State. He was convicted of first degree murder in both cases and was sentenced to imprisonment in the State Penitentiary for 99 years in each case, the trial judge ordered the sentences to be served consecutively, and the cases are now before this Court by his duly perfected appeal in the nature of a writ of error.

The defendant's fifth and sixth Assignments of Error challenge the sufficiency of the evidence to warrant and sustain the verdict of the jury, his specific insistence being that the evidence does not meet the requisite test for a conviction based on circumstantial evidence. The law is well settled in this State, and has been reiterated in numerous cases, that a guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State. Such a verdict removes the presumption of the innocence of the accused which stands as a witness for him until he is convicted, and raises a presumption of his guilt upon appeal, and he has the burden upon appeal of showing that the evidence preponderates against the verdict and in favor of his innocence. Jamison v. State, 220 Tenn. 280, 416 S.W.2d 768; Webster v. State, 1 Tenn.Cr.App. 1, 425 S.W.2d 799; Morelock v. State, 3 Tenn.Cr.App. 292, 460 S.W.2d 861.

This rule governing appellate review of criminal convictions makes unnecessary and, indeed, inappropriate, any detailed discussion of the evidence pro and con. Har-

grove v. State, 199 Tenn. 25, 28, 281 S.W. 2d 692, 694; Morrison v. State, 217 Tenn. 374, 397 S.W.2d 826, 400 S.W.2d 237.

We summarize the material evidence. On July 1, 1970, the bodies of the defendant's wife and step-daughter surfaced in Fort Loudon Lake, one in Blount County and the other in Knox County. The wife was wrapped in bedclothing and the child in bedclothing and a plastic shower curtain and a table cloth, both were partially encased in a plastic dry cleaning bag and tightly bound with ski ropes and heavily weighted—the child's body with a steel automobile wheel and the wife's with an old automobile starter and two concrete blocks. They were in an advanced stage of putrefaction, presenting a difficult identification problem. However, the defendant stipulated their identity during the trial. He also admitted wrapping and weighting their bodies and depositing them far out in the lake, claiming that he found them dead when he returned home the night of June 26, 1970, and carried their bodies out into the lake in his boat and disposed of them in this manner because he was a fugitive from the State of Kentucky and feared that any investigation into their deaths would reveal his true identity.

From the beginning Sotka has contended that his wife killed her daughter and then committed suicide. Both had been shot through the head with his 7.65 mm. Beretta semi-automatic pistol, which he took with him when he left his Knox County home and still had when arrested. The child was shot in the right temple and the bullet emerged in her left temple area. Mrs. Sotka was shot in the back of the head near the base of the skull and slightly to the right of center, and that bullet passed through her brain to the area of the left side of her face; her left eye was shattered, either by the bullet emerging or by bone fragments, and a bullet was found at post-mortem in the musculature of her left jaw. Death was instantaneous in both cases.

One empty 7.65 mm. cartridge casing was found in the wrappings around the child's body, another was found on a rug near her bed in the upstairs room of the Sotka home, and a third one was found in the downstairs bedroom under the bed where Mrs. Sotka was killed. No bullets were found inside the house. Her mattress and the one on the child's bed upstairs had been turned over to hide the bloodstains. In a pile of ashes behind the house, investigators found pennies, bobby pins, a burned lady's compact, pieces of cloth, metal buttons, paper clips, and garter hooks or hose fasteners.

The next day after these homicides and in the days immediately following, the defendant made various conflicting statements, some gratuitous and all false, concerning the whereabouts of his wife and step-daughter.

About midnight on Sunday, June 28th, the defendant picked up his girl friend Ruby when she finished her work shift at a Shoney's restaurant, where he also was once employed and became acquainted with her, and took her for a ride in his boat. He told her that his wife and daughter had gone to her sister's home and that she had finally agreed to leave and give him a divorce. A day or two earlier he told her at the restaurant: "How about me and you celebrating? I said, 'Celebrating what?' Then he said, 'I've lost a wife and gained a boat,'" and remained mute when she asked him what he meant by that statement.

On June 27th, the very next day after the homicides, according to the defendant, he told a fellow employee at the Volunteer Lincoln-Mercury Company that he and his wife had been having domestic difficulties because of his associations with waitresses at Shoney's restaurant, and that he had put his wife on a bus and sent her back to Kentucky; and a couple of days later he told the same fellow employee that his mother-in-law had called him and he was going up there and take his car and what

money they had and give it to his wife and tell her that he just wanted a divorce, and asked permission to be off from work to go to Kentucky.

The night of July 1, 1970 the defendant appeared at a filling station and gave a young man employed there $2.00 to drive him to his home, stating that he and his wife had gotten into an argument in town and she left with the car and he wanted to see if she was at home, and that she was jealous because of the women he worked with. They parked a short distance beyond the defendant's driveway; he went in the direction of his house and returned in a few minutes and said his wife was not at home.

On July 2, 1970 the defendant called a neighbor and asked him to watch after his house, stating that he was going to Kentucky for the week-end to be with his wife. He also talked to this neighbor's wife and told her that the doctor had put Mrs. Sotka to bed, and asked her to keep the step-daughter for a week inasmuch as she had no one to play with at her grandmother's house and wasn't very happy. The following Sunday, July 5, 1970, the defendant stopped at the home of the same neighbors and told them that his wife was sick and in bed in Kentucky fearing a miscarriage (she was pregnant) and gave them a Kentucky address which he represented as being that of Mrs. Sotka's mother. When a card sent to her at that address by this neighbor was returned marked "addressee unknown," they drove to Kentucky to investigate and, of course, found that Mrs. Sotka and her daughter had not been there. These neighbors then gave all that information to the Knox County Sheriff.

About July 7th or 8th, the defendant asked a boat dock operator to sell his boat for him, relating that because of his wife's health he no longer had any use for it and needed the money to pay some bills. On July 21, 1970 he sold the boat for $850 and told the purchaser that his wife was in a hospital in Kentucky and he had to arrange to pay the hospital bill.

Sometime before he sold his boat, Sotka sold some of his household goods to a furniture dealer in Knoxville. In response to the latter's inquiry about why he was selling his furniture, the defendant told him that his wife and child had left him and gone to Kentucky and "Well, I'm getting a divorce, and my lawyer told me to get rid of it." He also asked the dealer if he was interested in buying a gun and a boat.

About 1:30 p.m. on June 26, 1970 the defendant picked his wife up at her place of employment, a dry cleaning establishment where she was assistant manager. About 9:00 o'clock the next morning the defendant called the manager and told her that they had received a call from Kentucky advising that his wife's sister was sick and that he and his wife and step-daughter were going there for the week-end. The following Monday morning the defendant called the manager again and told her that his wife had gotten sick in Kentucky and the doctor had put her to bed. On July 7th he went to the cleaning establishment and told the manager that he was going to Kentucky to take his wife to her mother's home so her mother could care for her and that she would not be back to work. He turned in her keys to the establishment and picked up her paycheck.

On July 3, 1970 the defendant took a room at the Holiday Plaza Motel in Jellico and stayed there until about noon on July 5th. During that time he dated one of the restaurant waitresses two or three times, taking her to a movie near Williamsburg, Kentucky and to the Village Barn near Knoxville. Before dating him she asked him if he was married and he told her that he was divorced.

In the course of the investigation, the defendant's true name was ascertained about the 22nd day of July. He remained in the Knoxville area, for the most part, in and out, staying in motels, until about the 21st of July, and then went to Ohio where he was apprehended on September 26, 1970.

When the defendant was apprehended in a lady friend's apartment in Ohio by FBI agents and local officers and was advised that he was wanted on an unlawful flight warrant from Knoxville, he put up a terrific struggle in an effort to avoid arrest. After being fully advised of his constitutional rights, the defendant said, "I wish you had shot me, it would have been all over then." He then took the officers to his own apartment and gave them permission to search it and showed them a letter from his wife and requested them to preserve it. He told them where his Beretta 7.65 mm. pistol was and stated, "I know you can find out, I know you can run tests, this is the gun that killed them." He made no reply when one of the officers asked him, "Do you mean your wife and the little girl?" When the officer asked him why he didn't get rid of the gun, Sotka replied, "It was a good weapon. I've had it with me since I got in trouble in Louisville." At that time the defendant had assumed the name Ronald Turner. The Tennessee license plates for his automobile were found in his apartment, and he had replaced them with Ohio license plates registered to another.

Testifying in his own behalf, the defendant said that when he and his family moved to Knoxville about three years prior to the trial he was a fugitive from justice in Kentucky where he was convicted upon a plea of guilty and placed on probation; that Mrs. Sotka knew he was a fugitive; and that he assumed a new name [which was Ronald Freeman] and he and his wife obtained new social security cards, and "any other kind of identification papers that would have our new name on it," and that he sent away to a mail order house and got a "completely phony driver's license." On cross-examination he admitted that his Kentucky conviction was for stealing an automobile and that in December of 1967 he escaped from a probation and parole officer in Kentucky. On direct examination he testified regarding the several places he worked after coming to Knox-

ville, including Shoney's restaurant on Broadway where he was terminated because of his "fraternizing with the employees"—specially Ruby and Brenda; that his attentions to those waitresses and getting fired on that account displeased his wife immensely and she was very upset; that he then went to work at the Volunteer Lincoln-Mercury Company and shortly thereafter bought a boat on June 10, 1970 because they had owned one previously in Louisville, Kentucky and enjoyed using it; that this new boat was a "gift to both of us to kind of reunite our marriage"; that during the same month of June his wife became pregnant and they were both delighted with the prospect of having a baby, but it caused some anxiety because she had miscarried twice previously; that his wife was jealous of Brenda; that his hours at Volunteer Lincoln-Mercury were from 9:00 a. m. to 9:00 p. m. and she did not like his working at night, and "most of the time she didn't believe that I just came from work. She felt like if I got off from work at 9:00 o'clock, I should be home twenty minutes after 9:00," and that she made accusations against him about Brenda because of his tardiness in arriving home, which most always led to arguments; that during the last two weeks before his wife's death, Brenda was no longer serious to him and "my own marriage was my prime object of living, that's all I cared about anymore"; that during the week before her death, his wife brought up the subject of Brenda and told him that she knew that he and Brenda had stopped seeing each other and were no longer interested in having any kind of an affair, but she just couldn't put it out of her mind that he had looked at another woman; that "there really wasn't another woman involved at that time to be jealous of"; that on Thursday night, June 25, 1970, he was "just laying in bed daydreaming" and listening to country music on the radio and she accused him of thinking about Brenda and told him to stop listening to that music and thinking about Brenda; that "I just kind of smiled because it wasn't true and I was just listen-

ing to the radio—I mean I wasn't thinking about anything in particular, and I tried to act like there wasn't anything in what she was saying"; that on Friday, June 26, 1970, during his regular off-period, from 1:00 to 6:00 p.m., he went by the dry cleaning establishment where his wife worked and from there they went home and got into an argument, "the same argument that we had time and time again, concerning the same person," and he then went back to work; that when he arrived home that night after work, sometime after 9:00 o'clock, and entered the house:

" . . . I could smell something in the air but I didn't know for sure what it was—I didn't think. I could know what it was right now, but it never dawned on me what it was then. I yelled, 'Pat', and I went into the hallway that is between the kitchen and the bedroom, sort of a little walk way. From the light in the kitchen, I could see my wife laying on the bed in the bedroom and I just thought maybe she was asleep and I turned the light switch on, and I saw that there was blood all over the bed and everywhere else, and I turned the light back off real quick, I couldn't look, and I walked over to her, I touched her on the shoulder and said, 'Pat', I think I said it two or three times, and I just kind of stood there and looked, I didn't know what to do. As I was looking down, I don't know if I was thinking, I don't know what I was doing, but the note that I found was sitting there on the dresser, it was in my eyesight, I saw it, . . .

*     *     *     *     *     *

"It was just folded in half and it was sitting on the corner of the dresser, right opposite from where she was laying. I picked it up and I walked into the kitchen, the light was on, and I sat down at the table, and I read it through. I think I read it two or three times, trying to understand it. I just couldn't understand what had happened or why it had hap-

pened. I just didn't know. Then, I think after I read it about three times, I went to the cabinet, I had some whiskey there, and I think I took a few drinks of whiskey because I was just shaken all over and nervous and didn't know what to do. In the note, it mentioned about Donna [his step-daughter], and I started wondering where she was at, I thought maybe she was with someone else. I just didn't know what to think. I went upstairs to look, just to see if she was there and she was there. She was covered with blood, too.

*     *     *     *     *     *

"I went back downstairs and I read the note again and I think I set in the kitchen and I tried to think of something to do, someone to call, someone to ask for help, one of my neighbors or one of my friends, and I even thought about calling the police. I didn't know who to call, who to say anything to. My closest friends were the Bacons and at that time, I thought they were on vacation and I couldn't call them. When I thought about calling the police, I kept thinking if they did come out, they would find out about me being a fugitive, and I felt at that time that I might have as much as twenty years prison time back in Kentucky, and I didn't want to take a chance. I realize now that it was a mistake, but I didn't want to take a chance in informing the police and telling them who I was for fear I might be sent to prison for the charges in Kentucky. I sat there and I think I took a few more drinks of whiskey and tried to think why it happened and why it happened to me and our family. I didn't think that things were as bad as they were . . .

*     *     *     *     *     *

"Somewhere along the way, I decided that if nobody knew they were dead, if nobody knew that they had died, that possibly I wouldn't have to explain their death to anybody."

He testified that his wife was lying on her stomach on the bed, and that his pistol, which he kept under the mattress of that bed, was behind her head on the pillow and her hand was on it. He identified the note or letter as being in his wife's handwriting (as it admittedly was and which he had given to the officers at the time of his arrest). It was put in evidence and he read it to the jury. Undated, it follows:

"To my Ron, This is such a sad day. I am so alone. I had in mind to wait one more day and beg you to give me another chance but I guess I know there's no use and I couldn't bear to hear the words of last night again. I'm so sorry that I have made you unhappy. I know you and Donna deserve more. It's not that I want to be mean. All I ever wanted was for you to love me like you used to. I get so depressed sometimes, Ron, and after I don't even know why, but it is such a terrible feeling. I know this is the wrong thing to do, but I can't stand the way you want. I've known how sweet your love is and now you want to give it to someone else. It's more than I can stand. I've thought this all out and I can't find any way as to how I could overcome this and I don't even want to try. I must be an unlovable person. I truly don't know what I've done to make you hate me so, and even Donna, I don't think she really loves me. Ron, please, when you think of me, remember the times of our love and not these awful times, and, honey, please believe that I love you. To me, you are the best and grandest person I've ever known and I felt very lucky to have you. Not many people have what you can give and I was so happy Sunday. I thought sure you were loving me again. I probably did something to undue it all. I don't want to write any more. I have to get on with this before I change my mind. I have always before been able to see better days and hope, and I don't have that now. I'm sure this will all be over by the time you come home but if it isn't, whatever you do, don't take me to a doctor. I don't want them to give me any thing and then they would probably put me away. I know what I want so please don't try to stop me. Love you, Pat."

Sotka then told about wrapping the bodies because "I just couldn't look at them." He said when they were recovered, "I knew I would have to leave town" and he sold some of his furnishings and his boat. He attempted to explain his statement to Ruby that "I have lost a wife and gained a boat" in this way:

"What I really meant, I think,—what I meant was that she really didn't like the boat and since I had this time in the afternoon off, from 1:00 to 6:00 o'clock, well, she really didn't want to go out in the boat with me at that time, and I could go out on the boat myself, possibly with someone else, and so in that respect I lost a wife and gained a boat."

Asked about dating the girl in Jellico, the defendant explained: "Well, any time that I was by myself, I just couldn't stand it. Any time that I was alone in a room by myself, it just drove me crazy. I wanted to be with someone, or in a crowd, I had to be near somebody all the time. I just couldn't bear it."

He also testified that after his arrest: "I just felt deep shame for having done it and I will gladly say that I would wish they had shot me right there rather than having to face people after doing what I've done. And, I think I said it that way, right there in the hallway."

In an effort to explain about the automobile license plates, Sotka said he bought a 1964 Pontiac in Ohio, using the name Ronald Turner, and the seller retained the title because it was not fully paid for, and that it had been stolen before his arrest.

On cross-examination Sotka said he became infatuated with Brenda while they worked at Shoney's, admitted that he told Ruby about his love for Brenda during

their boat ride above referred to, and asking her if she thought Brenda would leave her husband; that his wife called Brenda on one occasion, and that his associations with those two waitresses precipitated a number of arguments and quarrels between him and his wife. He said when he merely smiled when she talked about Brenda on Thursday night, June 25th, that was only his way of trying to counteract her anger "I guess you would say." Asked whether he got mad at his wife at that time, Sotka said, "When I got mad, it was more inside, I didn't voice my opinion at her. I tried to console her." Referring to the language in the note about words spoken "last night," the cross-examiner asked Sotka: " . . . you actually didn't have any words of last night prior to the Friday of June 26th, did you, sir?" He replied, "Yes, we did have horrible words," and stated further that those horrible words were exchanged during the Thursday night incident when he said he only smiled at her. Later he testified on cross-examination that he said nothing to his wife on that occasion and that the only thing he did was smile. He also testified that during their final encounter on Friday afternoon, June 26th, she called him a liar when he answered negatively her question whether "I still thought about Brenda." He said that he saw the note on the dresser when he entered the room, but did not see the gun, although he stooped down and touched her and spoke to her, until he later entered the room after reading the note two or three times and going upstairs to the step-daughter's room. "Yes, I think it was after that, that I went back in to see Pat. I think that is when I noticed the gun. That's when I really started thinking"; "Well, I figured it was a gun from all the blood, but I just didn't think to look for a gun. It just wasn't on my mind to go see if there was a gun laying there." But he claimed the gun was in plain view on the pillow, right behind her head and was in her hand and was pointed toward the back of her head. He said he took some bloodstained articles from the boat when he returned to his house and then gathered up all the rags and clothing and bedclothing that were bloodstained and put all those things, along with some of his identification papers, "just a heap of things that I collected there that I had no further use for and I didn't want to look at" in the trunk of his car after he returned from depositing the bodies in the lake and before he went to the motel, and burned them in the yard; that he could not remember when he did the burning except that it was sometime between then and July 20th—he testified later that he burned those articles in the daytime and believed that he did so before July 5th; that he left the gun on the bed until after he returned from the lake and then wiped it off and took it with him; that he then packed a small suitcase and decided he could not stay at the house any longer and went to a motel shortly after 5:00 a.m. Saturday morning and gave a false address when he registered. He admitted that all the different stories he told regarding the whereabouts of his wife and step-daughter were false. He also admitted that during their boat ride Sunday night, June 28th he and Ruby drank a quantity of beer and engaged in sexual relations, and that they then went back to his house in the early morning hours of June 29th because "I couldn't stand to be by myself, that's why I took her back," and cleaned up and lay down on the bed for awhile before going to work.

Further, under cross-examination, the defendant said that when one of the officers returning him to Knoxville asked him about the note and whether he received it through the mail, he replied, "No, it didn't come to me in the mail," and that he told the officer he found it and declined to answer when asked how long he had had it. That officer testified in rebuttal that the defendant did not reply to any of his questions concerning the note.

Sotka also admitted that when his wife told him she was pregnant he told her, as she related to a neighbor who testified

about it, "Now, you've got me in a trap"; also, that although he was not in love with Brenda on June 26th, he did ask Ruby during their Sunday night boat ride if she thought Brenda would leave her husband; and that he told Brenda back in April or May that his wife and daughter were going to Kentucky to visit her relatives, whom he said she had not seen in three years and they didn't know where she was, although she was not planning to go to Kentucky. He admitted telling Brenda and Linda (another Shoney's waitress) that he wanted a divorce and his wife would not give him one.

On re-direct examination, the defendant testified that the reason he sought companionship with other women was "the discord between my wife and I . . . her not liking the house and the way it was built, the work I was doing, the amount of money I wasn't making, things like that. That's what made me turn to other women."

Contradicting his earlier statement that he kept his pistol under the mattress, the defendant testified on cross-examination that he kept it in a book shown to him by the Assistant District Attorney General. On re-direct examination about the book, he said that the night stand was the closest place to the bed and that he hollowed out a place in the book to keep the gun; ". . . one day during a rain or something, it just dawned on me that it would be a good idea to put it in a book and keep it on the night stand so it would be handy in case of a burglar, or in case people were prowling around at night."

Sotka's contention that his wife committed suicide was fairly presented to the jury in the trial court's charge:

"It is the defendant's theory in these cases that he did not kill the alleged victims, Donna Gail Foster and Patricia Freeman, but to the contrary that Patricia Freeman killed her daughter, Donna Gail Foster, and then committed suicide herself.

"Suicide is defined as death by one's own hand, in other words, self-destruction.

"Where the defense of suicide is raised, the jury may consider all the proof that is in the case which would go to show the conduct, declarations, and circumstances pointing to a suicidal disposition or intent on the part of the said Patricia Freeman, and you may further consider any evidence that may be present that would show an attitude of the deceased, Patricia Freeman, inconsistent with a disposition or intent to commit suicide on her part.

"In the instant cases you should look to all the evidence that has been introduced, and after considering all the facts and circumstances in proof, if you find that the State has not proved to your satisfaction beyond a reasonable doubt that the deceased Patricia Freeman's death was homicidal and not suicidal, then the defendant is entitled to the benefit of such doubt and he must be acquitted."

The jury was entitled to consider the fact that the defendant, patently with the purpose of concealing them forever, undertook to bury the bodies of his wife and step-daughter in the bottom of Fort Loudon Lake. As the trial judge instructed the jury, they were entitled to draw an inference of guilt from the defendant's disposition of the bodies in that manner, ". . . and while that inference is by no means strong enough itself to warrant a conviction, yet it may become one of a series of circumstances from which guilt may be logically inferred."

■ Any attempt to suppress or destroy or conceal evidence is relevant as a circumstance from which guilt of an accused so acting may be inferred. Thus, an inference of guilt may be drawn from the concealment or destruction of the corpse of the deceased. 1 Wharton's Criminal Evidence (12th Ed.) §§ 142, 207.

■ It was also relevant and the jury was entitled to consider the defendant's admitted and repeated fabrications attempting to explain the absence of his deceased wife and step-daughter by spreading false and conflicting reports that they had gone to Kentucky. 1 Wharton's Criminal Evidence (12th Ed.) § 209.

In Marable v. State, 203 Tenn. 440, 313 S.W.2d 451, our Supreme Court said this:

"Then it is a well recognized principle of criminal law that:

'The actions and behavior of accused when charged with the crime, or when confronted with the consequences or with the scene or surroundings of the crime with which he is charged, or when brought before the prosecuting witness for identification, or at the trial, are peculiarly relevant. In receiving evidence of this kind, it is not easy, if at all possible, for courts to draw any line segregating those acts which to some minds may seem significant of guilt from those which are irrelevant because justifying no such inference. Any *ex post facto* indication by accused of a desire to evade prosecution may be shown as one of series of circumstances from which guilt may be inferred.' 22 C.J.S. Criminal Law § 623, p. 955."

■ Thus, the fact that the defendant fled to Ohio, and to conceal his identity there he assumed the name of Ronald Turner—a name different from that of Ronald Freeman under which he lived in Knoxville—were circumstances from which, when considered together with all the other facts and circumstances in evidence, the jury could properly draw an inference of his guilt. 1 Wharton's Criminal Evidence (12th Ed.) §§ 139, 205. See also: Rogers v. State, 2 Tenn.Cr.App. 491, 455 S.W.2d 182; Craig v. State, 2 Tenn. Cr.App. 510, 455 S.W.2d 190.

■ The fact that a suspected person attempts to evade arrest or escape does not establish his guilt, but taken in connection with other facts may become one of a series of circumstances from which guilt may be inferred. Thus, the jury was entitled to consider the evidence showing the defendant's efforts to conceal his identity by the use of another alias after he went to Ohio, that he changed his automobile license plates, and his efforts to avoid being taken into custody and to escape when he was arrested. 1 Wharton's Criminal Evidence (12th Ed.) §§ 140, 206.

Of course, the defendant's convictions in these cases are based entirely upon circumstantial evidence. If his contentions are true his convictions cannot stand. In Pruitt v. State, 3 Tenn.Cr.App. 256, 460 S. W.2d 385, this Court reviewed the law applicable in circumstantial evidence cases:

"The rules applicable to criminal convictions based upon circumstantial evidence are well known. The law is firmly established in this State that to warrant a criminal conviction upon circumstantial evidence alone, the evidence must be not only consistent with the guilt of the accused but it must also be inconsistent with his innocence and must exclude every other reasonable theory or hypothesis except that of guilt, and it must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that he is the one who committed the crime. These rules are well stated in Marable v. State, 203 Tenn. 440, 313 S.W.2d 451:

'In a circumstantial evidence case of the kind here the evidence is tested by the following rules:

"(1) It should be acted upon with caution; (2) all the essential facts must be consistent with the hypothesis of guilt, as that is to be compared with all the facts proved; (3) the facts must exclude every other reasonable theory or hypothesis except that of guilt; (Lancaster v. State, 91 Tenn. 267, 18 S.W. 777) and (4) the facts must establish such a certainty of guilt

of the accused as to convince the mind beyond a reasonable doubt that the accused is the one who committed the offense." Wharton's Criminal Evidence, Vol. 2, pages 1605–1606.

"It is not necessary that each particular fact should be proved beyond a reasonable doubt if enough facts are proved to satisfy the jury, beyond a reasonable doubt, of all the facts necessary to constitute the crime charged * * *. Before a verdict of guilty is justified, the circumstances, taken together, must be of a conclusive nature and tendency, leading on the whole, to a satisfactory conclusion and producing in effect a moral certainty that the accused, and no one else, committed the offense." Wharton, *supra,* pages 1609–1610.

'And:

"Weight of circumstantial evidence is a question for the jury to determine. The inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury." Wharton, supra, page 1611.'

"In Marie v. State, 204 Tenn. 197, 319 S.W.2d 86, the Court said:

'This is a circumstantial evidence case and the rule is well settled that the evidence must be consistent with the guilt of the defendants and inconsistent with their innocence, and sufficiently strong to overcome every other reasonable hypothesis except that of guilt.'

"Again, in Jamison v. State, 209 Tenn. 426, 354 S.W.2d 252, the Court said this:

'* * * Of course, this evidence standing alone is purely circumstantial. This Court in Smith v. State, 205 Tenn. 502, 327 S.W.2d 308, at page 317 of 327 S.W.2d 522 of 205 Tenn., quoted from Wharton's Criminal Evi-

dence on the amount or the weight that circumstantial evidence should be given in a criminal case. That quotation is:

" 'Circumstantial evidence may by itself be sufficient proof of the commission of a crime and sufficient proof on which to base a conviction.' * * *

" 'In the effort to guard against improper verdicts, it is commonly stated that in determining the sufficiency of circumstantial evidence, (1) all the essential facts must be consistent with the hypothesis of guilt, as that is to be compared with all the facts proved; (2) the facts must exclude every other reasonable theory or hypothesis except that of guilt; and (3) the facts must establish such a certainty of guilt of the accused as to convince the mind beyond a reasonable doubt that the accused is the one who committed the offense.' "

* * * * * *

'The general rule ordinarily is that the evidence must be such as to remove all reasonable hypothesis other than guilt. This being the applicable rule of law it becomes necessary for the Court in each case to determine upon the facts and circumstances of that case whether or not it is brought within the rule.'

"The same rule is also stated in Harris v. State, 217 Tenn. 582, 399 S.W.2d 749:

'The rule has been well established in this State that where circumstantial evidence is relied upon for a conviction the essential facts must be consistent with the hypothesis of guilt, and all other reasonable theories or hypothesis except guilt must be excluded by the facts. Marable v. State, 203 Tenn. 440, 313 S.W.2d 451.' "

See also: State v. Crawford, 225 Tenn. 478, 470 S.W.2d 610.

The able and conscientious trial judge, in his instructions to the jury in this case,

fairly explained all of the legal principles which we have discussed herein.

This record leaves no room for doubt that protracted turbulence and discord disrupting their marriage resulted from the defendant's penchant for extra-marital feminine companionship, and particularly his association with Shoney's waitresses Ruby and Brenda. The defendant admitted that when his wife became pregnant he taunted her with the accusation that she had trapped him. His contention that she killed her small daughter and then took her own life is based upon the note which he says he found in the bedroom after finding her dead, and which he insists upon regarding as a murder-suicide note. Although it was stipulated that this note was written by Mrs. Sotka, it was not dated and the FBI handwriting expert testified there was no way to determine when it was written. The jury rejected this contention of the defendant. In our view it cannot be said with reason that the note contemplated or portended killing her daughter and herself. Although its meaning is not altogether clear, the note contains no such statements. Certainly no implication of intention and purpose to kill her daughter can be read into this note. According to Mrs. Sotka's friends and associates, the domestic climate in their home had greatly improved during the few weeks before this tragedy and she had lately shown a placidity of demeanor indicative of composure and serenity, and appeared happy about her pregnancy and elated with the prospect. There is not a word of testimony by the defendant or anyone else showing any conduct or declarations by Mrs. Sotka, or any circumstances, pointing to a suicidal intent. Nothing in this record establishes or so much as suggests that Mrs. Sotka had any motive to kill her daughter.

Based upon his findings and extensive experience, the pathologist who performed the autopsy on Mrs. Sotka's body gave it as his opinion that the wound in the back of her head was not a contact wound, i.e., that it was not inflicted by a gun held against her head, and that it had characteristics of a non-contact wound. Another pathologist, called as an expert witness by the defendant, was of opinion that the damage to Mrs. Sotka's left eye could have been produced by bone fragments loosened and carried forward by the bullet and that it could have been deflected into her jaw. No other entrance wound was found.

■ The jury obviously reached the conclusion that Mrs. Sotka did not destroy her child and herself. It is manifest that the jury, considering all of the defendant's conduct and actions and statements and his testimony, and the whole record, rejected as an incredible fabrication his story that he arrived home late at night and found them dead and his pistol in his wife's hand on the pillow beside her head, and that the jury was fully convinced, instead, that the defendant maliciously and deliberately and premeditatedly killed both of them to get them out of his way. The record confirms that judgment. With the whole evidence before it, the jury was not called upon to fathom a mystery. In our opinion the record conclusively demonstrates that the defendant's challenge to the sufficiency of the evidence cannot be sustained.

The defendant's first three Assignments of Error, reiterating complaints made in his motion for a new trial, charge the trial court erred in allowing the prosecuting attorney to ask him, over objection, about criminal cases pending against him for the purpose of attacking his credibility—knowing that he would rely on his Fifth Amendment rights. In the first place, in response to questions by his own counsel the defendant testified that he had been convicted upon a guilty plea in Kentucky and was a fugitive from justice in that State when he and his family moved to Knoxville; and on cross-examination about the same matter he stated that his Kentucky conviction was for stealing an automobile and that he escaped from a probation and parole officer in Kentucky in December of 1967. When the Assistant District

Attorney General asked him whether the reason he escaped was the fact that there were other charges pending against him, the defendant answered, "Yes, there were some other charges against me up there." Before the next question was completed, the jury was excused upon motion of defense counsel. Apart from the jury, defense counsel expressed anticipation that the Assistant District Attorney General intended to pry further into the defendant's altercation with his probation and parole officer. The Assistant District Attorney General stated that he had no intention of going into further detail about that matter, but that he had a right to ask the defendant about prior crimes he may have committed because such evidence "goes to his credibility as a witness." Defense counsel then stated: "I have no objection to him asking about any arrests and convictions. I do object to him going into whether or not he and the Parole Officer had an altercation."

In the presence of the jury, the Assistant District Attorney General asked the defendant whether he stole an automobile in Jefferson County, Kentucky, on November 11, 1966. When defense counsel's objection was overruled, the defendant stated he remembered the occurrence but not the date. He was then asked whether he changed the serial number on that automobile on November 17, 1966. After his objection was overruled, defense counsel stated: "Your Honor, please, I don't want the jury removed, but I do want this abundantly in the record, not to keep it from the jury, but this man may have to stand trial on these contentions here. He's not indicted and it's my belief, of course, that the General should be confined to those matters that the man has been arrested and convicted of, and that's our objection for the record."

Again the jury was excused, and in the ensuing colloquy the trial judge cited State v. Fowler, 213 Tenn. 239, 373 S.W.2d 460, and other cases, as authority for the proposition that while proof of other independ-

ent crimes, not relevant to any issue on trial, is inadmissible, yet when a defendant takes the witness stand as a witness for himself he is subject to cross-examination like any other witness; and for the purpose of affecting his credibility, he may be asked as to specific acts which involve moral turpitude or any other misconduct which tends to show his lack of veracity or trustworthiness.

The court then instructed defense counsel that he had a right to advise the defendant "to take the Fifth Amendment, it's his privilege." After consultation between the defendant and his counsel, the Assistant District Attorney General asked the defendant (1) about alteration of the automobile license number and whether the vehicle was owned by a certain individual, (2) whether he stole a Chevrolet automobile in Kentucky on July 7, 1966, (3) whether he stole a Dodge automobile in Kentucky on August 19, 1966, and (4) whether he stole a Plymouth automobile in Kentucky on August 30, 1966. The defendant answered each of those questions by invoking his Fifth Amendment privilege against self-incrimination.

In the presence of the jury, the Assistant District Attorney General asked the defendant the same questions, and also whether he stole a Chevrolet automobile in Kentucky on September 19, 1966, another Chevrolet on October 25, 1966, a Pontiac on January 17, 1967, whether he broke into the county courthouse in Whitley City, Kentucky in 1967 and stole a notary seal and a Bill of Sale, whether on June 12, 1967 he obtained money under false pretenses from a named company in Brandenburg, Kentucky, and whether he stole automobiles in Kentucky on June 1 and September 19, 1967. In response to each of those questions the defendant invoked his Fifth Amendment right against self-incrimination.

On re-direct examination, defense counsel asked the defendant whether, when he came to Knoxville, "you had been in a

whole lot of trouble? . . . and were a wanted man?" The defendant answered affirmatively.

■ Thus, with reference to his first three Assignments of Error, it clearly appears (1) under interrogation by his own counsel the defendant opened this question by testifying concerning a previous felony conviction in Kentucky (which cross-examination brought out was for car theft) and had been in a lot of trouble and was a wanted man and a fugitive from justice when he came to Knoxville, (2) he admitted only one additional automobile theft upon cross-examination, and (3) although the Assistant District Attorney General asked him about various other alleged Kentucky felonies no evidence was introduced concerning either of them, for the simple reason that the defendant asserted his Fifth Amendment rights and declined to answer. It is only speculation to say, as the defendant insists, that he was prejudiced before the jury by taking the Fifth Amendment repeatedly. In any event, however, it must be remembered that the defendant took the Fifth Amendment upon advice of his own counsel. Moreover, the trial judge carefully instructed the jury in his charge that any evidence of prior convictions could not be considered upon the question of the defendant's guilt or innocence, and could only be considered upon the question of his credibility as a witness. Those Assignments have no merit.

■ Equally baseless is the Assignment charging that the trial court erred in allowing the admission of photographs of a wrapped body, having reference to two photographs of the child's body made at the boat dock immediately after it was recovered from the lake, showing it wrapped and bound, with one arm protruding, and the automobile wheel attached. Unquestionably, those photographs were of material assistance to the jury in visualizing and understanding and evaluating the way and manner devised by the defendant to dispose of the body of his wife and step-daughter. There is nothing in this record to indicate that these photographs inflamed the minds of the jury and aroused their emotions to the defendant's prejudice. Admissiblity of photographs is a matter addressed to the sound discretion of the trial court. Palmer v. State, 1 Tenn.Cr.App. 223, 435 S.W.2d 128; Morelock v. State, 3 Tenn.Cr.App. 292, 460 S.W.2d 861.

■ Nor is there any substance in the defendant's Assignment complaining about admission in evidence of two teeth and bringing a lower jaw bone into the presence of the jury. As indicated at the outset, the bodies of the victims were in an advanced stage of decomposition, they were discolored and swollen beyond recognition, posing a difficult identification problem. At autopsy of the child's body, two upper molars containing dental fillings were extracted, and eventually the dentist who did that work was located. The teeth were admitted in evidence as a preliminary step in establishing identity of the body. When a jaw bone of the defendant's wife was produced by the State, as part of the tedious process of identifying her, the defendant's counsel stipulated that the recovered bodies were those of his wife and step-daughter, thus resolving the whole question of their identity. There is nothing whatever in this record to suggest that, in offering the teeth in evidence and in preparing to offer the jaw bone, the State had any purpose or motive except a bona fide effort to establish the identity of the victims—evidence vitally essential to the prosecution, until the defendant admitted their identity. Under those circumstances, and where it plainly was not calculated to inflame and prejudice the jury against the defendant, it is not error to admit parts of the murdered person's body. Turner v. State, 89 Tenn. 547, 15 S.W. 838; Bass v. State, 191 Tenn. 259, 275, 231 S.W.2d 707.

Finally, the defendant's insistence that the trial court committed error in permitting Dr. Robert B. Whittle to testify in areas in which he was not properly qualified is wholly untenable.

Dr. Whittle testified that, in his official capacity as assistant Knox County medical examiner—a position he had held for 10 years, he examined the bodies of the victims. He related extensive experience in numerous post-mortem examinations of gunshot victims to determine the cause of death, whether self-inflicted or otherwise. With particular reference to Mrs. Sotka, he described the location of the bullet wound in the back of her head and was of opinion that bullet exited through her left eye, explaining his reasons for that view. Upon objection by defense counsel, the court excused the jury when the State asked Dr. Whittle if he had an opinion as to whether or not Mrs. Sotka's wound was self-inflicted. After further testimony by the doctor and arguments of counsel apart from the jury, the court sustained the defendant's objection and ruled that the doctor would not be permitted to express an opinion before the jury as to whether Mrs. Sotka's bullet wound was self-inflicted.

With the jury present, in response to a juror's question about the wound to the left eye, Dr. Whittle testified without objection that " . . . the fibers of bone were splintered outward which indicates the degree of force was from inside out." When prosecution counsel asked him about the type of force it would take to blast out this eye and its orbital cavity, defense objection was overruled and the doctor stated that considerable force would be required and that "A fragment of bone being propelled could not hit it and break it this way, because a fragment of bone if propelled by something else would be quickly deviated to the other side. It has no self-propelling force itself. A missile has a self-propelling force. A fragment of bone only has the propulsion force of what hit it, so it has no self-propelling force, therefore, it is easily deviated."

Under further extensive cross-examination by defense counsel, Dr. Whittle agreed that a bullet entering the head may ricochet or be deflected, and also agreed with statements made on a designated page of a book entitled, "Legal Medicine, Pathology and Toxicology," which he read and the content of which does not appear in the record. As we view the matter, the doctor's training and vast experience with gunshot wounds and his knowledge of firearms qualified him to express an opinion concerning the nature and amount of force necessary to inflict the damage to the eye and the eye socket or cavity which he described, notwithstanding he was not a ballistics expert as such.

There is no prejudicial error in this record. The defendant has had a fair trial. Let the judgments of the trial court be affirmed.

WALKER, P. J., and O'BRIEN, J., concur.