IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 3, 2005

## STATE OF TENNESSEE v. JEFFERY YATES

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-00754     Joseph B. Dailey, Judge**

_____

**No. W2003-02422-CCA-MR3-CD  - Filed July 21, 2005**

_____

The Defendant, Jeffery Yates, was convicted by a jury of aggravated robbery.  The trial court sentenced him as a Range III, career offender to thirty years in the Department of Correction.  In this direct appeal, the Defendant raises the following challenges to his conviction:  (1) the sufficiency of the evidence; (2) the trial court's handling of the victim's statement to the police; (3) the trial court's admission of testimony regarding the Defendant's involvement in a prostitution sting; (4) the trial court's refusal to allow the Defendant to cross-examine his co-defendant about gang affiliation; (5) the trial court's decision to allow the State to cross-examine the Defendant about prior convictions; and (6) the trial court's failure to instruct the jury on the lesser-included offense of theft. Finding no reversible error in the issues raised by the Defendant, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and JOHN EVERETT WILLIAMS, J., joined.

Chris J. Lareau (on appeal) and Michael E. Scholl (at trial), Memphis, Tennessee, for the appellant, Jeffery Yates.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; William L. Gibbons, District Attorney General; and Jennifer Nichols and Steve Jones, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## FACTS

The victim of the aggravated robbery in this case, Chandera McCracken, testified that, on the night of August 24, 2001, she was living with her boyfriend, Leremy Bogard. Mr. Bogard's brother, Pinkie Wilson, also stayed there frequently. On the night in question, however, Ms. McCracken was alone. At about eleven o'clock that evening, Ms. McCracken heard a knock on the front door. She looked through the peep hole and observed a man she knew named Mike Key. Mr. Key asked her if a girl named Alicia stayed there. Ms. McCracken responded in the negative and Mr. Key left.

Ms. McCracken resumed her household chores and then lay down on the couch. She fell asleep and was awakened an hour or two later by "a big pounding on the door." Two men came in through the door and Ms. McCracken "woke up to a gun in [her] face," held by Mr. Key. Mr. Key told her, "You better tell me where the dope money - I'll kill you, weak-ass nigger. Where the shit at?" As Mr. Key accosted her, his cohort was going through other rooms in the house. Mr. Key grabbed Ms. McCracken around the neck and took her into the bedroom where his accomplice was. Ms. McCracken testified that this other man was wearing a bandana around the lower half of his face, covering "an inch of the nose." Nevertheless, she recognized him as a friend of her friend Shamere Talley. Ms. McCracken identified this individual at trial as the Defendant.

Mr. Key demanded that she show them where the "dope" was and she directed them to a closet in the bedroom. From the closet, the men retrieved some cocaine, some money, and a coat. Mr. Key then threw Ms. McCracken face down across the bed. Ms. McCracken testified that the Defendant said, "You need to tie her m****r-f*****g ass up. We're gonna kill her ass." Mr. Key then duct-taped Ms. McCracken's hands and feet together and one of the men pulled her pants down. As she continued to lay on the bed, she heard the two men running through the house. Mr. Key periodically returned to the bedroom and threatened to shoot her if she moved.

About forty-five minutes after the break-in occurred, Mr. Wilson returned home. Ms. McCracken heard him pull into the driveway and then heard the Defendant and Mr. Key leave the house through the back door. Mr. Wilson entered the house and found Ms. McCracken. He untaped her and they went next door to call the police.

After the police arrived, Ms. McCracken told them that one of her assailants was Mike Key. She also showed them where Mr. Key's mother lived, which was nearby. She told them that she knew of the other suspect, but she did not at that time know his name. The police officers took photographs of the front door, disturbed furniture, and the duct tape with which she had been bound. On September 3, 2001, Ms. McCracken viewed a photographic array containing Mr. Key's photograph, and she identified him as one of her assailants. She also viewed another array containing the Defendant's photograph, and she identified him as her other assailant.

Ms. McCracken stated that she had seen the Defendant three or four times before the break-in. She recognized him during the offense because of his eyes, his build, his height, and his complexion.

On cross-examination, Ms. McCracken admitted to having pled guilty in May 2002 to theft of property under $500. She further admitted that she obtained the Defendant's name from a girlfriend before she identified him to the police.

Pinkie Wilson testified that, on the night in question, he went to a high school football game and then to a friend's house. He returned home between twelve-thirty and one o'clock that morning. When he got home, he saw that the front door had been kicked in, with the deadbolt still in the locked position. When he went in, he found Ms. McCracken "lying on the bed taped up." Her pants had been pulled down and she was crying. The house was also in disarray, with "everything . . . on the floor and stuff." The back door was open. Mr. Wilson freed Ms. McCracken and they then went next door, where he called the police.

Officer Alvin Peppers testified that he collected the evidence at the crime scene. When he arrived, he noticed that the front door appeared to have been kicked in, as it had shoe prints on it. The locking mechanism was in place, the door facing was laying on the floor, and there was extensive damage to the door. The house appeared to have been ransacked, with items of furniture overturned and the rooms in disarray. He took several photographs of the scene, but determined that there were no good surfaces from which to collect fingerprints. He collected the duct tape with which the victim had been bound.

Lieutenant Jeffrey Polk testified that he met with the victim on September 3, 2001, and took her statement. He also presented her with a photographic array containing the Defendant's photograph. He stated that the victim had called him the day before and provided him with the Defendant's name. The photographic array contained six photographs. The victim used a sheet of paper to cover the lower half of the subjects' faces while she viewed the array. She then identified the Defendant. Lt. Polk stated that Ms. McCracken was "firm" in her identification.

Lt. Polk first spoke with Ms. McCracken on the day of the crime. When he asked her about the circumstances surrounding the robbery, she initially told him that her boyfriend sometimes sold drugs. She then "became reluctant to go forward . . . and told [him] there was too much confusion about all of this." About a week later, Ms. McCracken contacted him and told him that she wanted to prosecute. She also gave him the Defendant's name.

Upon determining that the suspects were Michael Key and the Defendant, Lt. Polk obtained warrants for their arrests on September 11, 2001. He distributed a "broadcast" to uniform patrol containing the suspects' last-known addresses, physical descriptions and photographs in an effort to apprehend them. Michael Key was arrested on October 3, 2001, and Lt. Polk interviewed him the next day. Mr. Key gave a written statement at that time.

On cross-examination, Lt. Polk acknowledged that Ms. McCracken initially described the second assailant to the reporting officers as a black male, about twenty-two years old, five feet eleven inches tall, slim build, "bright-skinned" wearing a "doo-rag" on his head, black jeans, black T-shirt, and a black bandana tied below his eyes. She also told the officers that this second assailant had not been armed. When Lt. Polk spoke with her directly the first time, she gave him Michael Key's name but did not give him the Defendant's name or state that she knew him. She also stated during this initial conversation that money and a jacket had been stolen, but did not state that drugs had been stolen.

Officer Jonas Holgoin testified that, on the night of September 21, 2001, he was working on a prostitution sting operation. The operation involved a female undercover officer agreeing to provide sex for money to a customer. The agreement was reached in the front of a hotel and the customer was then sent to the rear of the hotel. Officer Holgoin was waiting in the parking lot to "takedown" the customers as they made their way to the back of the hotel. Officer Holgoin and Detective Boyce were notified to take down a particular black male and as they began to do so, the suspect looked at them, turned, and jumped a wooden fence. The officers announced who they were and gave chase. They jumped the fence and found themselves in a thickly wooded area. They continued to chase the suspect for an hour to an hour and a half.

Eventually, Officer Holgoin was able to grab the suspect by the leg and a struggle ensued during which the suspect struck Officer Holgoin in the head. Officer Holgoin testified that "[i]t was very difficult to take him into custody." Officer Holgoin was eventually able to handcuff the suspect. Officer Holgoin identified the Defendant at trial as the suspect that he captured.

On cross-examination, Officer Holgoin acknowledged that he had not been looking for the Defendant that night. He chased the Defendant because he was identified as a suspect in the prostitution sting, not because of an arrest warrant concerning the robbery. Officer Holgoin did not find out about the arrest warrant until after he had taken the Defendant into custody.

Trent Hall testified that he became Michael Key's attorney in October 2001. Mr. Key had been charged with aggravated robbery. Mr. Key indicated from the beginning that he wanted to plead guilty. Mr. Hall explained to him that, if he did so, he would be making himself available as a witness in the State's case against his co-defendant, Jeffrey Yates. Mr. Key understood and acknowledged this. The State offered Mr. Key a plea bargain involving a sentence of fifteen years with a release eligibility date of thirty-five percent. Mr. Key eventually pled guilty to aggravated robbery with an agreed sentence of twelve years and a release eligibility date of thirty-five percent. However, the plea agreement was not made in exchange for any promised testimony.

Michael Key testified that he was currently serving a sentence of twelve years at thirty-five percent for aggravated robbery. He acknowledged having been convicted of theft of property over $10,000 in 1999 and use of a firearm during a drug trafficking offense in 1993. He identified Ms. McCracken at trial as the woman he and the Defendant robbed in August 2001.

Mr. Key testified that he and the Defendant went to the victim's house on the night in question and he went to the door to see if someone was there. The Defendant did not accompany him to the door on this initial visit. It was the Defendant's idea to go to that particular house; the Defendant told him that "they had a whole lot of drugs and some money there."

During the initial visit, Mr. Key went to the door and it was answered by the victim. He asked if a woman, whose name he could not remember, lived there, and the victim told him no. This initial visit was a ruse to determine who was in the house at the time. He returned to the truck where the Defendant was waiting and reported that the victim was in the house.

Mr. Key testified that they planned on returning to the house with some guns and demanding that the victim turn over the drugs and money. They planned on kicking the door in; during the actual break-in, they had to kick it about five times to get the door open. Mr. Key stated that he and the Defendant each had a gun. They went in and the victim was hollering. Mr. Key grabbed her and told her to "lay down." They asked for the drugs and money. Mr. Key testified that he had a shirt covering his face and the Defendant was wearing a mask. The Defendant told Mr. Key to hold Ms. McCracken. While Mr. Key did so, the Defendant got some duct tape and told Mr. Key to take Ms. McCracken to the bedroom. Once there, they tied her up with the duct tape at the Defendant's direction.

Before they tied up the victim, Mr. Key asked her for the money and the drugs. She produced a vase which contained twelve rocks of cocaine. The Defendant took these drugs. Mr. Key stated that there was no money. The Defendant also took a jacket and put it on. After they tied Ms. McCracken, they continued looking through the house for drugs and money. The Defendant found some wheel rims that he put on a blanket to steal, but they heard someone drive up and the Defendant did not have time to take the rims. The two men ran out the back door. The only thing that Mr. Key took with him was the gun and the roll of duct tape. Mr. Key testified that he got the gun that he used that night from the Defendant.

Mr. Key stated that he was arrested for this crime on October 3, 2001. The next day, he spoke with the police and agreed to make a statement. He told them about the robbery and stated that the Defendant had been his accomplice. No one made him any promises in return for his statement. He subsequently pled guilty as charged and received an agreed-upon sentence of twelve years. He received no deals in exchange for his plea.

On cross-examination, Mr. Key stated that he had never seen the victim before the night of the crime. He maintained that the Defendant directed the execution of the crime.

The Defendant testified, stating that he was not with Michael Key on the night of the robbery. On cross-examination, the Defendant admitted having been convicted of five counts of aggravated assault, two counts of possession of a controlled substance with intent to sell, one count of attempted aggravated robbery, one count of especially aggravated kidnapping and one count of

-5-

aggravated kidnapping. However, the Defendant claimed that these convictions had been reversed on post-conviction and remanded for a new trial.

On rebuttal, Kimberly Tanzy, the criminal court deputy court clerk, testified that all of the Defendant's convictions about which he had been cross-examined were still valid and had not been reversed.

After hearing the above proof, the jury convicted the Defendant of aggravated robbery.

## ANALYSIS

### I.  Sufficiency of the Evidence

Initially, the Defendant contends that the evidence supporting his identity as the perpetrator of the aggravated robbery against Ms. McCracken is insufficient.[1]  Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."  A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt.  See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom.  See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599.  A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory.  See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).  Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence.  See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659.  Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact.  See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

We acknowledge, of course, that the identity of the perpetrator is an essential element of any crime, see State v. Thompson, 519 S.W.2d 789, 793 (Tenn. 1975), and therefore must be proven by the State beyond a reasonable doubt.  We have no trouble concluding, however, that the evidence

---

[1]The State contends at the outset of its appellate brief that the Defendant's appeal should be dismissed for failure to timely file a notice of appeal.  However, this Court filed an Order on October 13, 2003, waiving the timely filing of the Defendant's notice of appeal and giving the Defendant fifteen days from entry of the Order in which to file his notice of appeal.  The Defendant subsequently filed his notice of appeal on October 28, 2003.  This appeal is therefore properly and timely before this Court.

in this case is sufficient to establish that the Defendant assisted Michael Key in committing the instant crime.

The Defendant attacks Ms. McCracken's identification of him on the basis that she was not able to identify him to police officers by name until after speaking with a friend of hers. However, Ms. McCracken testified that she recognized the Defendant during the robbery because she had seen him several times before. She gave a physical description of him to the police. She identified his photograph from an array. She identified him at trial. That the Defendant was wearing a partial mask during the robbery, and that Ms. McCracken did not know his name at the time, go to the weight and credibility of Ms. McCracken's testimony: issues for the jury's determination, which will not be second-guessed by this Court.

Ms. McCracken's testimony was, in and of itself, sufficient to establish the Defendant's identity. However, the Defendant's accomplice also testified and identified the Defendant as the co-perpetrator of the robbery.

The Defendant testified that he was not with Michael Key on the night of the offense. Nevertheless, it was up to the jury to weigh the competing testimonies and decide which witnesses it would believe. The jury chose to accredit the testimonies of Ms. McCracken and Mr. Key, which the jury was entitled to do. The jury chose to reject the Defendant's testimony, which the jury was also entitled to do. On our review, we have determined that the proof of the Defendant's identity was sufficient for the jury to conclude beyond a reasonable doubt that the Defendant participated in the aggravated robbery of Ms. McCracken. Accordingly, this issue is without merit.

## II. Rehabilitation of Witness with Prior Statement

During his cross-examination of Ms. McCracken, defense counsel asked her about the statement she gave to the police, which had been reduced to a writing including both the investigating officer's questions and Ms. McCracken's answers. Specifically, defense counsel referred to the officer's question, "Did you recognize the other participant?" Defense counsel continued, "You said: 'Yes, by his eyes, but I didn't know his name. A couple of days later, I called my friend.'" Defense counsel then stated, "And it goes on down further, and it says: 'She told me it was Jeffery Yates.'" Defense counsel followed this narrative with the question, "So you told the police that your friend gave you that information, didn't you?" Ms. McCracken responded, "No. I told my friend girl [sic] that used to talk to him - I had asked her what was his name because I didn't know him by his real name. I had to ask her who he was because I had seen him before with her."

On redirect, the State requested to introduce into evidence the actual statement. The trial court refused to admit the written statement itself but told the State that it could question Ms. McCracken about it, including reading portions of it aloud and asking her about those portions. The State particularly wanted admitted the full text of Ms. McCracken's answer to the question, "Did you recognize the other participant?" The full text of that response was, "Yes, by his eyes, but I didn't know his name. A couple of days later, I called my friend, told her what had happened, and asked

<u>her did she know anybody who does robberies with Mike Key.</u> She told me his name was Jeffery Yates" (emphasis added).

Defense counsel objected strenuously to the admission of the full response. The trial court weighed the probative value of the contested evidence against its unfair prejudice,[2] stating "What is relevant here is the credibility of the victim in this case. Perhaps the sole witness who will testify regarding the events of that night. And whether it's unfair to the state to allow the cross-examination that was conducted to go unanswered by not allowing the state to put into evidence the entirety [of the] response that was given." The court continued:

> Well, I don't like rewriting history, but I'm thinking that - I mean the - the risk involved is the portion where she says, "I asked her did she know anybody who does robberies with Mike Key. She told me his name was Jeffery Yates."
> We don't know the basis for this witness' knowledge of robberies. We don't know how many robberies she's referring to - a hundred, five hundred, two. We don't know - we don't have any factual basis for any of these, quote, robberies. If it were asked - "And a couple of days later, I called my friend and told her what had happened and asked her did she know anybody who could have done this robbery with Mike Key. She told me his name was Jeffery Yates." That would narrow it to one and would eliminate the prejudice of suggesting that there were multiple robberies, and it would still allow the witness' credibility to be rehabilitated, I think, by showing that, yes, she did recognize the person. She recognized him by his eyes, but she didn't know his name; and because she didn't know his name, she called her friend a couple of days later after a specific question - told her what happened, asked her the question, "And she told me his name was Jeffery Yates." Then that would, then, explain how she came to give that name to the police.
> And so while that rewords slightly actually what the witness told the police, it doesn't change - it doesn't really affect the content of the answer except to take out of the answer - the suggestion of multiple robberies. I'm a little concerned about getting into that because absent of any factual basis, whatsoever, for those multiple robberies with Mike Key.
> But to word if [sic] after, "Did she know anybody who could have done this robbery with Mike Key." I'll allow that.

Subsequently, on redirect examination, the prosecutor questioned Ms. McCracken as follows:

> Q   Do you remember the police asking you, "Did you recognize the other participant?" Do you remember them asking you that question?
> A   Yes, ma'am.

---

[2]Our Rules of Evidence provide that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Tenn. R. Evid. 403.

Q    And did you respond, "Yes, by his eyes, but I didn't know his name.  A couple of days later, I called my friend, told her what had happened, and <u>asked her did she know anybody who could have done this robbery with Mike Key.</u>  She told me his name was Jeffery Yates."  Is that what happened?
A    Yes, ma'am.

(emphasis added).  The Defendant now contends that the trial court erred both in altering Ms. McCracken's statement to the police, and in allowing the State to question her about it.

Initially, we agree with the Defendant that the trial court committed error when it directed the State to alter the text of Ms. McCracken's statement to the police.  While we are certainly sympathetic with the trial court's effort to simultaneously allow the State to rehabilitate its witness while preventing the jury from hearing unduly prejudicial evidence, we are constrained to disapprove of the method utilized by the trial court.  Nothing in our Rules of Evidence permits a trial court to rewrite a witness's prior statement.  Moreover, it was unnecessary to the State's effort to rehabilitate Ms. McCracken.  The State wanted to demonstrate that Ms. McCracken did in fact recognize the Defendant during the commission of the crime and needed her friend's assistance only to the extent of identifying him by name.  It could have done so by simply asking Ms. McCracken why she had called her friend after the robbery, and by reiterating that she had not known the Defendant's name until after that phone call.  The State could further have questioned Ms. McCracken about whether the conversation with her friend had had any effect on the certainty of her identification.  This approach would have allowed the State to demonstrate that Ms. McCracken's statement to the police was consistent with her trial testimony, to wit, that she had recognized the Defendant during the crime, but needed help in determining his name.  At the same time, it would have kept from the jury the suggestion that the Defendant's name was given to her because her friend either knew of past robberies committed by the Defendant with Mike Key, and/or knew that the Defendant was predisposed to commit the instant crime.

The trial court's ruling was also in contravention of our Rule of Evidence 404(b), which prohibits the introduction of proof concerning a criminal defendant's prior bad acts when offered to prove that the defendant acted in conformity with a character trait.  That Rule provides as follows:

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait.  It may, however, be admissible for other purposes.  The conditions which must be satisfied before allowing such evidence are:
(1)  The court upon request must hold a hearing outside the jury's presence;
(2)  The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence; and
(3)  The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b) (2003). The State's questions to Ms. McCracken on redirect suggested to the jury that Ms. McCracken's friend knew that the Defendant was someone "who could have done this robbery with Mike Key." This "proof" was in the nature of propensity evidence. The statement implies that Ms. McCracken's friend knew that the Defendant was the type of person who committed robberies: therefore, he must have been the perpetrator of the instant crime. This is precisely the type of evidence which Rule 404(b) is designed to exclude from the jury's consideration. Thus, not only did the trial court err in allowing the State to ask the witness to verify a statement that the trial court, the prosecutor, defense counsel and the witness all knew was, in fact, inaccurate, but the trial court further erred in failing to exclude inadmissible evidence.

We review a trial court's erroneous admission of evidence under a harmless error standard. See Tenn. R. Crim. P. 52(a). Thus, the Defendant is not entitled to relief on this issue unless the trial court's error affirmatively appears to have affected the result of the trial on the merits. See id. We find the trial court's error in admitting the contested portion of Ms. McCracken's pretrial statement to be harmless. The State presented eyewitness testimony from the victim that the Defendant participated in the aggravated robbery. She explained why she could not identify the Defendant by name to the police initially. She later identified the Defendant's photograph from an array of six photographs, and the attending officer described her identification at that time as "firm." She also identified the Defendant at trial. The Defendant's co-defendant, Mike Key, testified that the Defendant assisted him in committing the aggravated robbery of the victim. This proof was more than enough to convict the Defendant, and we are confident that any inference that the jury may have drawn from the victim's (altered) statement to the police made no difference in the jury's verdict. Accordingly, the Defendant is not entitled to relief on this issue.

## III. Evidence of Prior Bad Act

The State adduced proof that the Defendant was apprehended during a prostitution sting, but only after a lengthy chase. Prior to the admission of this evidence, the trial court conducted a jury-out hearing on the Defendant's objection to its admissibility. The trial court allowed the State to question Officer Holgoin both about the circumstances of the Defendant's arrest and his attempts to evade it. The Defendant now asserts that the trial court's ruling was erroneous.

As set forth above, our Rule of Evidence 404 provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes." Tenn. R. Evid. 404(b) (2003). In this instance, however, the State was not offering evidence about what the Defendant was doing at the time of his apprehension in order to prove the Defendant's character or actions in conformity therewith. Rather, the State was striving to prove that the Defendant's attempt to evade his arrest stemmed from his desire to avoid prosecution on the aggravated robbery charge and not from a desire to avoid being arrested for patronizing prostitution. The State's theory was that the magnitude of the Defendant's effort to avoid his arrest was out of proportion to the seriousness of an arrest for patronizing prostitution: a mere misdemeanor. See Tenn. Code Ann. § 39-13-514(b). The trial court agreed that the Defendant's flight from the police was relevant to the Defendant's state of mind, and ruled that it was for the jury to decide the reason for the

Defendant's flight. The actual issue before us, then, is whether the trial court abused its discretion in determining that the probative value of the challenged proof was not outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 404(b)(3) (2003); State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

"A defendant's flight and attempts to evade arrest are relevant as circumstances from which, when considered with the other facts and circumstances in evidence, a jury can properly draw an inference of guilt." State v. Zagorski, 701 S.W.2d 808, 813 (Tenn. 1985); see also Sotka v. State, 503 S.W.2d 212, 221 (Tenn. Crim. App. 1972). Moreover, "[c]ircumstances surrounding a defendant's arrest, even though they may show the commission of another crime, are admissible if they have probative value in establishing guilt." Zagorski at 813. In this case, two plausible explanations existed for the Defendant's flight from the police when they attempted to arrest him. The most obvious was the Defendant's desire to avoid being arrested for the crime he was in the process of committing when he was apprehended: patronizing prostitution. See Tenn. Code Ann. § 39-13-514(a). The less obvious reason for the Defendant's flight, but certainly a reasonable and rational one, was his desire to avoid prosecution for the instant crime.

The aggravated robbery was committed on the night of August 24, 2001. Lt. Polk testified that, on September 8, he generated a "flyer" for uniformed patrol officers containing the Defendant's last-known address, physical description and photograph. This flyer was generated and made available to patrol officers in an effort to apprehend the Defendant. On September 11, Lt. Polk obtained a warrant for the Defendant's arrest and he followed that up with a "media release."

The prostitution sting during which the Defendant was apprehended was on September 21, 2001. Thus, less than a month had passed since the robbery was committed. Approximately two weeks had passed since patrol officers were alerted to be on the lookout for the Defendant, and only ten days since a warrant was issued for the Defendant's arrest. It is certainly reasonable to infer that, as of September 21, the Defendant was concerned about his possible arrest for the August robbery of Ms. McCracken.

A criminal defendant's state of mind is a classic jury issue. However, it is relevant only when it pertains to the crime for which the defendant is being tried. In this case, the trial court had to make an initial determination about whether the Defendant's attempt to evade arrest was relevant to proving his guilt of the aggravated robbery. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401 (emphasis added). Here, Officer Holgoin testified that the Defendant evaded capture for over an hour by concealing himself in a thickly wooded area. Once apprehended, the Defendant struggled to the extent that he struck Officer Holgoin. Officer Holgoin testified that it had been "very difficult" to take the Defendant into custody. The effort used by the Defendant to evade his apprehension lends credence to the suggestion that he was concerned with avoiding something far more serious than an arrest on a misdemeanor charge. Accordingly, under the facts and circumstances of this case, we conclude that the trial court did not abuse its discretion in determining

-11-

that the Defendant's flight from police officers during the prostitution sting had some tendency to establish his identity and guilty knowledge concerning the aggravated robbery, and was therefore potentially admissible under Tennessee Rule of Evidence 404(b).

The trial court then had to determine whether the probative value of this proof was outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 404(b)(3) (2003). The potentially unfair prejudice in this case stemmed from the Defendant's involvement in the subsequent crime of patronizing prostitution, which the jury may have relied upon as evidence indicative of the Defendant's propensity to commit crimes. However, the trial court gave the jury the following instruction concerning this matter:

> Ladies and gentlemen of the jury, any testimony offered that may have related to any alleged prostitution or attempted prostitution charges has been presented solely for the purpose of explaining the circumstances that allegedly existed at the time of this defendant's arrest.
> The fact that this defendant may have allegedly been involved in prostitution or attempted prostitution charges cannot be held against him in any way, nor can it be used to lessen the presumption of innocence in this case.

We are confident that this instruction overcame any danger of unfair prejudice relating to the circumstances under which the Defendant was apprehended. Accordingly, we hold that the trial court did not abuse its discretion in admitting proof about the Defendant's flight and the circumstances preceding it. This issue is without merit.

## IV. Limits on Cross-examination of Mike Key

During his cross-examination of Mike Key, defense counsel asked if he knew a man by the nickname of "Five Ball." Mr. Key admitted that he knew "of" Five Ball, but denied having "hung out" with him. Defense counsel persisted:

Q You used to hang out with a bunch of these guys, didn't you?
A No.
Q Did you have a little group of friends that you hung out with, Mr. Key?
A No. I don't just hang with a whole lot of people.
Q Do you remember there being organizations in your neighborhood?

At this point, the State requested a bench conference and objected to this line of questioning. Defense counsel stated that he planned to ask Mr. Key if he was a member of the Gangster Disciples, because it was "mentioned in the police reports about a guy by the name of Frederick Howard. And talking with people, [defense counsel had] information that [Mike Key] may have been involved with this individual in actually committing this robbery. Frederick Howard looks just like [the Defendant]." Defense counsel continued: "Frederick Howard is also linked to this organization, and it's - and these guys all have been committing these crimes and covering up for the other one."

The trial court determined that Mr. Key's possible affiliation with the Gangster Disciples was not relevant because there was no proof to indicate that the gang was involved with the crime or that Frederick Howard had been involved. The trial court stated,

> I'm not going to allow you to get into a fishing expedition about gang affiliation at this point. You might be able to recall this witness if that were to develop - if proof were to develop to substantiate where you're heading. But at this point in time, I've heard nothing to substantiate it.

The Defendant now contends that the trial court's ruling was erroneous.

We disagree. We review a trial court's rulings on the relevance of proffered proof under an abuse of discretion standard. See DuBose, 953 S.W.2d at 652. We see no abuse of discretion here. There was no proof that the aggravated robbery had any connection to a gang. Therefore, Mr. Key's possible affiliation with a gang had no bearing on the Defendant's guilt or innocence. As noted by the trial court, Mr. Key's political or religious affiliations might have also been noted in the police report, but were irrelevant to proving the identity of the persons who committed the aggravated robbery. The trial court did not abuse its discretion in refusing to allow defense counsel to pursue this line of questioning. This issue is without merit.

## V. Admission of Defendant's Prior Criminal Convictions

Prior to the Defendant's decision to testify, the trial court held a jury-out hearing to determine whether the State could examine him about prior convictions for impeachment purposes. The trial court concluded that the Defendant could be asked about ten prior felony convictions: an especially aggravated kidnapping, an aggravated kidnapping, an attempted aggravated robbery, five aggravated assaults, and two drug offenses. The Defendant now contends that the trial court erred in allowing the State to impeach the Defendant with these convictions. The Defendant argues that the probative value of these convictions with respect to his credibility was outweighed by their unfairly prejudicial effect.

The admissibility of a criminal accused's prior criminal record for impeachment purposes is governed by Tennessee Rule of Evidence 609. That Rule provides, in pertinent part, as follows:

> For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime may be admitted if the following procedures and conditions are satisfied:
> . . .
> (2) The crime must be punishable by death or imprisonment in excess of one year under the law under which the witness was convicted or, if not so punishable, the crime must have involved dishonesty or false statement.
> (3) If the witness to be impeached is the accused in a criminal prosecution, the State must give the accused reasonable written notice of the impeaching conviction before trial, and the court upon request must determine that the

conviction's probative value on credibility outweighs its unfair prejudicial effect on the substantive issues. . . .

Tenn. R. Evid. 609(a). It is the trial court's weighing process referred to in subsection (3) which the Defendant now challenges.

With respect to this provision, our supreme court instructs us that,

[I]n determining whether the probative value of a conviction on the issue of credibility outweighs its unfair prejudicial effect upon the substantive issues, two criteria are especially relevant. A trial court should first analyze the relevance the impeaching conviction has to the issue of credibility. Trial courts should explain on the record how the impeaching conviction is relevant to the defendant's credibility. If the conviction is probative of the defendant's credibility, the trial court should secondly "assess the similarity between the crime on trial and the crime underlying the impeaching conviction." When an impeaching conviction is substantially similar to the crime for which the defendant is being tried, there is a danger that jurors will erroneously utilize the impeaching conviction as propensity evidence of guilt and conclude that since the defendant committed a similar offense, he or she is probably guilty of the offense charged. Accordingly, the unfairly prejudicial effect of an impeaching conviction on the substantive issues greatly increases if the impeaching conviction is substantially similar to the crime for which the defendant is being tried. Therefore, trial courts should carefully balance the probative value of the impeaching conviction on credibility against its unfairly prejudicial effect on substantive issues.

State v. Mixon, 983 S.W.2d 661, 674 (Tenn. 1999) (citations omitted). This Court reviews a trial court's ruling on the admissibility of prior convictions for impeachment purposes under an abuse of discretion standard. See State v. Waller, 118 S.W.3d 368, 371 (Tenn. 2003).

We will first address the Defendant's five convictions of aggravated assault. All of these convictions occurred in 1994. The trial court did not explain on the record how these convictions were relevant to the Defendant's credibility. However, this Court has previously held that "'felonies of a violent nature reflect on the moral character of a witness' and . . . 'this evidence is not usually without probative value.'" State v. Blanton, 926 S.W.2d 953, 960 (Tenn. Crim. App. 1996) (quoting State v. Daniel Strong, No. 88-82-III, 1989 WL 34942, at *2 (Tenn. Crim. App., Nashville, April 12, 1989)). This Court has previously affirmed a trial court's decision to allow impeachment with a prior conviction for aggravated assault. See, e.g., State v. Deadrick M. Pigg, M2000-03056-CCA-MR3-CD, 2001 WL 1502659, at *3 (Tenn. Crim. App., Nashville, Nov. 27, 2001); State v. Michael Brady, No. M1999-02253-CCA-R3-CD, 2001 WL 30220, at *5 (Tenn. Crim. App., Nashville, Jan. 12, 2001). Additionally, our supreme court has recognized that multiple prior convictions are more probative of credibility than a single conviction. See Waller, 118 S.W.3d at 373. Here, the Defendant put his credibility squarely at issue because he took the witness stand and denied that he had been with Michael Key on the night of the aggravated robbery. The probative value of past

-14-

actions of poor moral character became particularly important, therefore. Accordingly, we find that the trial court did not err in determining that the Defendant's past convictions of aggravated assault were probative of his credibility.

The next step is assessing the similarity between the prior convictions and the offense for which the Defendant was on trial. The trial court did not perform this analysis on the record. We do so, therefore, de novo. The transcript of the sentencing hearing indicates that all of the aggravated assaults committed by the Defendant as an adult were committed with a deadly weapon. The aggravated robbery in this case also involved the use or display of a deadly weapon. Thus, there is some similarity between the Defendant's crimes of aggravated assault and the aggravated robbery for which he was on trial. "However, the fact that a prior conviction involves a similar crime for which the defendant is being tried does not automatically require its exclusion." State v. Blevins, 968 S.W.2d 888, 893 (Tenn. Crim. App. 1997). See also Waller, 118 S.W. 3d at 373 (acknowledging that "evidence of a prior conviction that is substantially similar to the charged offense is not per se inadmissible for impeachment purposes").

While the Defendant's prior aggravated assaults and the instant aggravated robbery share a common element, we hold that, under the facts and circumstances of this case, the prior crimes and the instant crime are not "substantially similar" such that the danger of unfair prejudice outweighed the probative value of the prior convictions. The jury was given no information about the facts underlying the prior aggravated assault convictions, and so did not know that they involved a gun. The goal of an aggravated robbery is the theft of property; the goal of an aggravated assault is to threaten or harm another individual. The Defendant's prior convictions of aggravated assault were not so similar to the crime for which he was on trial that the jury was likely to utilize them as propensity evidence. Accordingly, we conclude that the trial court did not abuse its discretion in allowing the State to impeach the Defendant with his prior convictions of aggravated assault.

We turn now to the trial court's decision to allow the Defendant to be impeached with his 1993 convictions of aggravated kidnapping and especially aggravated kidnapping. These crimes were committed in December 1991. The aggravated kidnapping was committed to facilitate the commission of an aggravated robbery. See Tenn. Code Ann. § 39-13-304(a)(1) (1991). The especially aggravated kidnapping involved the Defendant's taking the victim as a hostage. See id. § 39-13-305(a)(3) (1991). Both of these crimes were committed in conjunction with an attempted aggravated robbery. Aggravated robbery is accomplished with a deadly weapon or serious bodily injury to the victim. See id. § 39-13-402(a). Accordingly, the kidnapping convictions involved the use of violence.[3] Like the aggravated assaults, then, these two prior convictions were somewhat probative of the Defendant's credibility. See Blanton, 926 S.W. 2d at 960.

As with the aggravated assault convictions, the jury was given no information about the facts underlying the kidnapping convictions. Nor was the jury advised about the statutory elements of

---

[3]We have gleaned these facts about the kidnapping convictions from the transcript of the Defendant's sentencing hearing.

these prior convictions. Thus, there was little danger that the jury was going to conclude that these prior convictions were so similar to the instant crime that it would have relied on the kidnapping convictions as propensity evidence. Accordingly, we conclude that the probative value of these prior convictions was not outweighed by the risk of unfair prejudice, and the trial court therefore did not abuse its discretion in allowing the State to question the Defendant about them.

We turn now to the Defendant's prior conviction for attempted aggravated robbery. This crime was also committed in December 1991, with the conviction occurring in 1994. Our supreme court has recognized that robbery is a crime involving dishonesty that may be used for impeachment purposes. See State v. Galmore, 994 S.W.2d 120, 122 (Tenn. 1999). Obviously, an attempted aggravated robbery is very similar to a completed aggravated robbery, the offense for which the Defendant was being tried. With respect to this prior conviction, the trial court did make a specific finding with regard to its admissibility for impeachment purposes: "Well, robbery being simply an enhanced form of larceny, I think is the type of offense that would go directly to the issue of credibility. So I think that the probative value would outweigh any prejudicial effect in this case."

By choosing to testify and denying his presence at the scene of the crime, the Defendant put his credibility squarely at issue in this case. This Court has previously held that, under similar circumstances, a prior conviction for attempted especially aggravated robbery was admissible for impeachment purposes where the defendant was on trial for aggravated robbery. See State v. Thomas D. Stanton, No. M2003-03049-CCA-R3-CD, 2005 WL 639139, at *13 (Tenn. Crim. App., Nashville, Mar. 17, 2005). Although the trial court should have addressed with more specificity the balancing process it utilized in determining that the probative value of the prior conviction outweighed the danger of unfair prejudice, we conclude that the trial court did not abuse its discretion in determining the admissibility of the Defendant's prior conviction for attempted aggravated robbery.

Finally, we turn to the trial court's decision with regard to the Defendant's two prior convictions for the unlawful possession of a controlled substance with intent to sell. Our supreme court has determined that such offenses are "at best, only slightly probative of [a defendant's] credibility." Waller, 118 S.W.3d at 373. They are also, however, completely dissimilar to the crime of aggravated robbery for which the Defendant was being tried. There was, accordingly, very little if any danger of unfair prejudice attaching to the admission of these convictions for impeachment purposes. Given the broad nature of a trial court's discretion in conducting the balancing test required by Tennessee Rule of Evidence 609, we decline to hold that the trial court abused its discretion in making this determination.[4]

Thus, we have determined that the trial court did not abuse its discretion in deeming admissible for impeachment purposes the Defendant's prior convictions. Accordingly, the Defendant is not entitled to relief on this issue.

---

[4]We also note that defense counsel did not object at trial to the court's ruling with respect to these two convictions.

## VI. Lesser-included Offense of Theft

In his final issue, the Defendant posits that the trial court committed reversible error when it failed to instruct the jury on the lesser-included offense of theft. We disagree.

"A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. Aggravated robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear, accomplished with a deadly weapon. See id. § 39-13-402(a)(1). Theft is a lesser-included offense of aggravated robbery. See State v. Bowles, 52 S.W.3d 69, 79-80 (Tenn. 2001); State v. Burns, 6 S.W.3d 453, 466 (Tenn. 1999) (instructing that an offense is a lesser-included offense if all of its statutory elements are included within the statutory elements of the charged offense). Accordingly, the trial court had a duty to instruct the jury on theft as a lesser-included offense of aggravated robbery if it determined that (1) there existed evidence that reasonable minds could accept as to the commission of a theft, and (2) the evidence of theft was legally sufficient to support a conviction of that offense. See Burns at 469.

The proof in this case established that the Defendant obtained from Ms. McCracken some cocaine, a sum of money, and a jacket without her effective consent. The proof was sufficient to have supported a conviction of theft. The trial court should have instructed the jury on the lesser-included offense of theft.

We review a trial court's failure to instruct the jury on a lesser-included offense under a constitutional harmless error standard. See State v. Allen, 69 S.W.3d 181, 191 (Tenn. 2002). We have no trouble concluding that the trial court's error in this case was harmless beyond a reasonable doubt. The trial court instructed the jury on the lesser-included offenses of facilitation of aggravated robbery, robbery, and facilitation of robbery. The jury rejected all of these lesser-included offenses. Because the jury rejected the immediately lesser-included offenses of facilitation of aggravated robbery, and robbery, we conclude beyond a reasonable doubt that it would also have rejected the lesser-included offense of theft had it been charged. See State v. Williams, 977 S.W.2d 101, 106 (Tenn. 1998). The Defendant is therefore entitled to no relief on this basis.

## CONCLUSION

The trial court having committed no reversible error, we affirm the judgment of the trial court.

_____
DAVID H. WELLES, JUDGE

-17-