# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs January 13, 2009

## STATE OF TENNESSEE v. TAMMY GARNER

### Direct Appeal from the Circuit Court for Grundy County
### No. 4272-B  Thomas W. Graham, Judge

---

### No. M2008-01253-CCA-R3-CD - Filed May 15, 2009

---

A Grundy County jury convicted the Defendant, Tammy Garner, of theft of property valued at less than $500.  The trial court sentenced her to serve one month in jail, followed by nine months on probation, and to pay $500 in restitution.  On appeal, the Defendant claims that: (1) the evidence presented was insufficient to support her conviction; and (2) the trial court erroneously sentenced her.  After a thorough review of the record and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Robert G. Morgan, Jasper, Tennessee, for the Appellant, Tammy Garner.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Frank Borger-Gilligan, Assistant Attorney General; J. Michael Taylor, District Attorney General; Stephen Strain, Assistant District Attorney General, for the State of Tennessee.

## OPINION

### I.  Facts

### A.  Trial

A Grundy County grand jury indicted the Defendant on one count of theft of property valued at more than $1000 but less than $10,000.  At trial, the following evidence was presented:  James Avery Sweeton, Jr., testified that, on May 13, 2005, he was cleaning up a local cemetery with Jeff Porterfield when Adam Whitman and the Defendant drove up on a green Honda 300 all-terrain vehicle ("ATV").  At that time, Sweeton knew Whitman but not the Defendant.  Sweeton noticed

the ATV had a camouflaged pouch across its gas tank, similar to his friend Jeff Spain's ATV. He also noticed that the wires were cut above the key area and "the wires was hanging loose." Whitman told Sweeton he had "babied" the ATV "for some, time." After talking some more, Whitman and the Defendant left the cemetery, and Sweeton drove to Spain's house.

Sweeton arrived at Spain's house and asked if Spain's ATV was missing. Spain "looked out and the chain . . . lay[] there and his [ATV] was gone." Sweeton said he helped Spain look for his ATV that night. The following day, Sweeton and Spain resumed their search, and they saw Whitman and a woman, who Sweeton thought was the Defendant, on the ATV. Sweeton testified that, when Whitman saw him and Spain, Whitman turned the ATV around and drove away from them. Spain tried to catch them, but he could not. Sweeton later saw Whitman a third time on the ATV, and the Defendant was not with him.

On cross-examination, Sweeton said that he drank a few beers at the cemetery. Additionally, he said the Defendant remained on the ATV the entire time while the men talked, and she only said "hello" to him. While conversing, Whitman never acknowledged to Sweeton that the ATV was not his. Sweeton stated that he knew Whitman had previously borrowed the ATV from Spain and that Whitman and Spain were previously related by marriage. Sweeton arrived at Spain's house about fifteen minutes after Whitman and the Defendant left the cemetery. Once at Spain's house, Sweeton and Spain followed the ATV tracks from its normal storage place into the woods and out onto a road.

Jeff Porterfield testified that, in May 2005, he was pulling weeds with Sweeton in a local cemetery when Whitman and the Defendant arrived on an ATV. After Whitman and the Defendant left the cemetery, Sweeton took Porterfield home on his way to Spain's house. On cross-examination, Porterfield elaborated that he was with Sweeton for "a good hour," during which he did not recall any alcohol being present. Porterfield did not know Whitman or the Defendant at that time, although he heard Whitman's name used in the conversation. Porterfield said he heard Whitman tell Sweeton that he was "baby-sitting" the ATV for awhile.

Jeff Spain testified that he owned a 300 Honda ATV in May 2005. He paid $2000 for it, and he kept it "in tiptop shape" because his children played on it. Whitman was Spain's ex-brother-in-law, and Spain had loaned Whitman his ATV once while they were still related. Spain testified that he did not loan Whitman his ATV on May 13, 2005.

Recounting May 13, 2005, Spain recalled last seeing his ATV around noon that day. Spain said that he kept the ATV chained to his ton truck with a Masterlock on it and that only he possessed the keys to unlock the Masterlock and to start the ATV. Spain left his house to pick his children up from school around 2:40 p.m., and they returned around 3:30 to 4:00 p.m. Spain said he had only been home about fifteen minutes when Sweeton arrived at the door. Sweeton asked him if his ATV was missing, and he realized it was. Spain and Sweeton followed the tracks of the ATV until the tracks came out on a road. They then borrowed another ATV to continue looking for Spain's missing ATV. Neither man knew where Whitman lived, so they checked for him at his mother's house. Spain and Sweeton looked for the ATV until 10 p.m., and they resumed their search the next

day using Spain's pickup truck.

While searching in the truck on May 14, Spain and Sweeton saw Whitman driving Spain's ATV with the Defendant as his passenger. Spain sped up when he saw the ATV, and, he described that, when Whitman saw him approaching, Whitman "made a U turn in the highway and then sped off." Spain eventually lost Whitman in the woods. Spain recounted that he saw Whitman driving a different ATV two months later. Spain said that neither Whitman nor the Defendant returned the ATV, told him where it was, or offered to compensate him for it. At some point, Spain contacted the police and gave them Whitman's name.

On cross-examination, Spain said he and Whitman had only one disagreement before his ATV disappeared: Whitman was angry at Spain for towing one of Whitman's vehicles to Spain's house. Spain said he did not know the Defendant, but he later heard that a woman named "Garner" dated Whitman around the time when his ATV was taken. Spain clarified that he called the sheriff the afternoon of May 13, 2005, when he initially discovered that his ATV was missing.

Spain further elaborated on the time when he saw Whitman and the Defendant on a different ATV several months after he saw Whitman riding with the Defendant: he said that Whitman "pulled a gun on [him] and [he] shot [Whitman] with rat shot," and he explained that "rat shot" was "little pellets that kill[] snakes and rats."

Spain said he saw the Defendant after seeing her on the ATV with Whitman, and she made a particular offensive hand gesture towards him when she saw him. Spain estimated the ATV to be worth $3000.

The Defendant then testified that she used to be a nurse but that she no longer worked. She met Whitman through a mutual friend in 2005, and she attributed the casual nature of their relationship to him being "in jail most of the time." Additionally, she knew he was dating several other women at the same time. After dating a few months, the Defendant ended their relationship because she thought he was not a good role model for her children. The Defendant explained that she did not specifically recall May 13 or May 14, 2005 and that, while she dated Whitman, he asked her to go on several ATV rides.

The Defendant did specifically recall Spain chasing them in July 2005. She recounted that she and Whitman were riding an ATV and that a Chevrolet Blazer "tried to run [them] off the road" and it "took off real fast toward [them]." The Defendant did not recognize the driver. She said that Whitman tried driving them away from the Blazer but that the ATV stalled. At that point, the driver in the Blazer "pulled out a shotgun and started firing," and the Defendant returned fire with the pistol that was on the ATV. She said rat shot struck her in her arm and struck Whitman in his temple and back. The Defendant said she asked Whitman who the man in the Blazer was, and he explained it was his ex-brother-in-law, who took Whitman's luxury sports car and sold it.

The Defendant testified that she did not know how Spain's ATV ended up missing and that

3

she did not know Whitman had Spain's ATV.

On cross-examination, the Defendant said that the time she and Whitman rode in the ATV in May 2005, she remembered a key in the ignition. She said that she first met Spain in July 2005 and that she did not report him shooting at her because it was not "major." The Defendant learned that Spain's ATV was stolen when she turned herself into the Grundy County Sheriff's Department. The Defendant said she gave Spain an offensive hand gesture because he threatened her children.

After hearing the evidence, the jury convicted the Defendant of theft of property valued at less than $500.

## B. Sentencing

At the sentencing hearing, the State introduced the presentence report and the victim impact statements. The Defendant testified, and she apologized and said she did not know where the ATV was. After considering the evidence, the trial court sentenced the Defendant to serve one month in jail and nine months on probation along with paying $500 in restitution. It is from this judgment that the Defendant now appeals.

## II. Analysis

On appeal, the Defendant claims that: (1) the evidence presented did not sufficiently support the conviction; and (2) the trial court erroneously sentenced her.

## A. Sufficiency of the Evidence

The Defendant argues that the evidence presented was not sufficient to support her conviction of theft. Specifically, she claims that she did not exercise control over the stolen property. The State argues that the Defendant knew the property was stolen and that she assisted in the theft and failed to inform authorities about it, which prove that she exercised control over the property.

In Tennessee, "[a] person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." T.C.A. § 39-14-103 (2003). The grading of theft is based on the value of the property, and theft of property valued at less than $500 is a Class A misdemeanor. T.C.A. § 39-14-105 (2003). According to *State v. Amanns*, for a conviction of theft, the State must prove the defendant: (1) knowingly obtained or exercised control over property; (2) did not have the owner's effective consent; and (3) intended to deprive the owner of the property. 2 S.W.3d 241, 244-45 (Tenn. Crim. App. 1999). Additionally, theft by obtaining property and theft by exercising control over the property are treated as the same offense. *State v. Kennedy*, 7 S.W.3d 58, 70 (Tenn. Crim. App. 1999). The Tennessee Pattern Jury Instructions define "exercise control over property" as:

4

the right to direct how property, real or personal, shall be used or disposed. Generally one must possess the right of possession in property in order to exercise control over it. Such possession may be actual or constructive, sole or joint. Also, one may have the right to control property without having a possessory interest. In such instances, if the defendant takes some action with the intent to deprive the owner of the property, and the defendant did so knowingly and without the owner's effective consent, the jury would be justified in returning a verdict of guilty. Anyone who is in a position to take some action that deprives the owner of property is in a position to exercise control.

T.P.I.-Crim. 11.01.

The Tennessee Supreme Court has held that a jury may infer that a defendant committed theft if he provides an unsatisfactory explanation of why he was in possession of very recently stolen property. *State v. Hatchett*, 560 S.W.2d 627, 629 (Tenn. 1987). This inference of guilt is permissible even if there is contradictory evidence. *See State v. Land*, 681 S.W.2d 589, 591 (Tenn. Crim. App. 1984). Additionally, if a defendant is a passenger in a stolen vehicle, and the defendant is throwing items out the window while being chased by the police, the jury may convict the defendant of theft based on his presence and actions in the stolen vehicle. *See State v. Michael E. Owenby*, No. E2001-02012-CCA-R3-CD, 2002 WL 2012653, at *3 (Tenn. Crim. App., at Knoxville, Aug. 28, 2002), *no Tenn. R. App. P. 11 application filed*. As the holding in *Owenby* suggests, a jury may also infer guilt based on a defendant's attempt to flee or evade arrest, when considered in conjunction with the other facts and circumstances. *Id.*; *Sotka v. State*, 503 S.W.2d 212, 221 (Tenn. Crim. App. 1972); *State v. George Harold Terry*, 1989 WL 1233, at *2 (Tenn. Crim. App., at Knoxville, Jan. 12, 1989), *perm. app. denied* (Tenn. Apr. 3, 1989) (holding that defendant, who was passenger in a vehicle that was slowly driving away from a tire store with recently stolen property, was "looking around" suspiciously, and the jury could have considered this when convicting him). Similarly, in *State v. Amy Denise Sutton*, the Tennessee Supreme Court ruled that the evidence presented was sufficient to support the defendant's theft conviction because the fact that the defendant lied to police supported the jury's inference that she knew the property was stolen, and thus, that she exercised control over that property. 166 S.W.3d 686, 691-92 (Tenn. June 30, 2005); *see Michael E. Owenby*, 2002 WL 2012653, at *3 (jury was also permitted to infer theft based on the defendant's lie to police officer that he and the driver just purchased the car for one hundred dollars).

On the other hand, in *State v. Knight*, the evidence was considered insufficient to support a conviction for theft when the defendant was present while a person with whom the defendant lived cashed a forged check. 969 S.W.2d 939, 942 (Tenn. Crim. App. 1997). Furthermore, this Court has stated, "To be sure, mere presence in an area where stolen property is found or mere association with a person who does, in fact, control stolen property is insufficient to establish theft beyond a reasonable doubt." *State v. Tommy William Davis*, No. E2002-00511-CCA-R3-CD, 2003 WL 649113, at *6 (Tenn. Crim. App., at Knoxville, Feb. 28, 2003), *perm. app. denied* (Tenn. June 30, 2003).

5

After considering the facts in the light most favorable to the State, we conclude that the evidence presented was sufficient to support the Defendant's conviction for theft of property. First, she knowingly exercised control of the property. *See Amanns*, 25 S.W.3d at 244-45. The Defendant rode multiple times with Whitman on the ATV, and she had joint control over the ATV with Whitman. She was his passenger within hours of the ATV's disappearance. *See Hatchett*, 560 S.W.2d at 629*;see also Michael E. Owenby*, 2002 WL 2012653, at *3. Moreover, the Defendant's involvement with the ATV was much more than merely being present around or living with the person who stole it, as in *Knight.* 969 S.W.2d at 942; *see also Tommy William Davis*, 2003 WL 649113, at *6. The Defendant actively protected herself, Whitman, and the ATV by shooting back at Spain with a pistol she found on the ATV after Spain shot at her with rat shot. Thus, we conclude the Defendant exercised control over the ATV.

Second, the Defendant did not have the owner's effective consent. *See Amanns*, 25 S.W.3d at 244-45. Spain testified that he had not given the Defendant or Whitman consent to take or ride the ATV. Moreover, the ATV had wires hanging loosely from it showing that it had been "hotwired," as opposed to having been started with the keys. Spain said that he had the only two keys used to start the ATV. Therefore, we conclude the Defendant did not have Spain's effective consent to possess the ATV.

Finally, the Defendant intended to deprive the owner of his property. *See Amanns*, 25 S.W.3d at 244-45. When the Defendant first rode on the ATV, it was "hotwired," and Whitman said he was "babysitting" it. The jury could have inferred that at that point, the Defendant knew the ATV was stolen. Rather than report the ATV as stolen, the Defendant rode on the ATV again, which was the time when Spain chased them into the woods. This evidence supports the inference that the Defendant intended to deprive the rightful owner of his ATV. Moreover, the Defendant did not report the shooting incident between to the authorities. A jury could infer that the Defendant failed to report the shooting incident to the authorities because she knew the ATV was stolen and an investigation by the authorities would reveal this fact. We conclude that the evidence presented was sufficient for her conviction of theft of property and that the Defendant is not entitled to relief.

**B. Sentencing**

The Defendant argues that the trial court failed to comply with the requirements of the 1989 Sentencing Reform Act. The State argues that the trial court appropriately sentenced the Defendant.

We review misdemeanor sentencing *de novo* with a presumption of correctness. T.C.A. §§ 40-35-401(d), -402(d). "[T]he presumption of correctness . . . is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). The appealing party bears the burden of overcoming this presumption of correctness and showing that the trial court erred. T.C.A. § 40-35-401(d) (2006) Sentencing Comm'n Cmts.

A trial court is required to conduct a hearing where the parties have "a reasonable opportunity to be heard on the question of the length of any sentence and the manner in which the sentence is to be served." T.C.A. § 40-35-302(a) (2006). When determining the sentence length, the court must "fix a specific number of months, days or hours," and it must also "fix a percentage of the sentence that the defendant shall serve." T.C.A. § 40-35-302(a), (b). While weighing the Defendant's eligibility for an alternative sentence, the trial court should consider whether:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

T.C.A. § 40-35-103 (2006). After determining the length and manner of the Defendant's sentence, the trial court must also set a percentage defining when the defendant "shall be eligible for consideration for work release, furlough, trusty statue and related rehabilitative programs." T.C.A. § 40-35-302(d); *State v. Troutmann*, 979 S.W.2d 271, 274 (Tenn. 1998). When determining the percentage of the sentence to be served before the defendant is eligible for programs, the trial court "shall consider," but does not have to state in the record, the enhancement and mitigating factors applicable to the case. T.C.A. § 40-35-302(d); *Troutmann*, 979 S.W.2d at 274. The trial courts have continuing jurisdiction and a great deal of flexibility when sentencing a defendant for a misdemeanor. *See* T.C.A. § 40-35-302(d), Sentencing Comm'n Cmts.; *State v. Boyd*, 925 S.W.2d 237, 244 (Tenn. Crim. App. 1995).

When sentencing the Defendant, the trial court explained that it mainly relied on the Defendant's previous convictions:

> I'm going to apply the . . . main enhancement factor number one in this case multiple previous criminal convictions that's got to have some effect on the sentence, even in a misdemeanor case, so I'm going to sentence her to 10 months in the county jail.
>
> She will have to serve 30 days, she'll be on probation for the rest of the 10 months. She get credit for the five days she's served.

We initially note that because the Defendant committed the offense after July 1, 1982, but before June 7, 2005, and because she was sentenced after June 7, 2005, she had the option to be sentenced under the sentencing act of 1989 or under the 2005 amendments. *See* T.C.A. § 40-35-210 (2006). The Defendant did not waive her rights to be sentenced under the Sentencing Act of 1989 without the 2005 amendments, so we will consider only the pre-2005 amendment sentencing law. *See* Compiler's Notes to T.C.A. § 40-35-210 (2006). The Defendant was convicted of theft of property valued at less than $500, which is a class A misdemeanor. T.C.A. § 39-14-105. Persons

7

convicted of class A misdemeanors may be sentenced up to eleven months and twenty-nine days or be fined up to $2500 or both. T.C.A. § 40-35-111 (2003). One of the applicable enhancement factors that a trial court may consider when sentencing a defendant is the defendant's previous history of criminal convictions or criminal behavior. T.C.A. § 40-35-114 (2003).

According to the presentence report, the Defendant's prior criminal convictions included unlawful drug paraphenalia in 2000 and passing a worthless check valued at $500 or less in 1999. Thus, she had previous criminal convictions. It was proper for the trial court to consider the Defendant's prior convictions. *See* T.C.A. § 40-35-114. Moreover, the trial court's sentence of ten months and restitution of $500 is within the appropriate range for a Class A misdemeanor. *See* T.C.A. § 40-35-111. Additionally, the trial court's splitting the Defendant's sentence into one month of incarceration and nine months of probation is permitted. T.C.A. § 40-35-104(c)(3) (2003). We conclude the trial court properly sentenced the Defendant, and she is not entitled to relief.

### III. Conclusion

After a thorough review of the record and the applicable law, we conclude that the Defendant's conviction was sufficiently supported by the evidence presented and that the trial court properly sentenced her. As such, we affirm the trial court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

8